235 So.2d 200 (1970)
Thomas EDKINS
v.
Dr. R. G. EDWARDS et al.
No. 3948.
Court of Appeal of Louisiana, Fourth Circuit.
May 4, 1970.
*201 Duplantier & McPherson, by James A. McPherson, New Orleans, for defendants-appellants.
James J. Grevemberg, New Orleans, for plaintiff-appellee.
Before CHASEZ, BARNETTE and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This is an action in tort wherein plaintiff Thomas Edkins, age 30, seeks damages, jointly and in solido, from the defendants Dr. R. G. Edwards and Dr. D. M. Ettinger, and Carrollton Chiropractic Clinic, a partnership composed of defendants Edwards and Ettinger, resulting from an alleged tortious act committed by defendant Ettinger *202 on July 26, 1966 while plaintiff was a patient in the office of defendants. He alleges that Dr. Ettinger, a chiropractor, manipulated his head and neck in such a fashion as to cause an intervertebral disc rupture in the cervical area at the C-5 and C-6 levels.
At the trial certain medical expenses and loss of wages were stipulated to and at the termination thereof the trial judge resolved the case in plaintiff's favor against the three defendants jointly and in solido, granting judgment in the sum of $6,000.00 for injury, pain and suffering and $3,773.88 for special damages and loss of wages. Defendants have appealed devolutively from the trial court's judgment.
Our first concern on this appeal is a determination of whether the case presented is one in tort based on simple, general negligence or is it one theorized on malpractice in which event negligence would have to be proved based on the standard of care, required of a chiropractor, to a patient. Neither plaintiff nor defendants produced evidence touching upon the standard of care involved in the practice of chiropractic.
Dating back to 1927 it has been the law of Louisiana that chiropractors are covered by and subject to the provisions of the Louisiana Medical Practice Act (LSA-R.S. 37:1261 et seq.) and inasmuch a chiropractic is a healing art designed to relieve human ailments by manipulation and adjustment of the spine, any person so practicing in this field must be licensed under the aforementioned Louisiana Medical Practice Act. (Louisiana State Board of Medical Examiners v. Fife, 162 La. 681, 111 So. 58, 54 A.L.R. 594; affirmed 274 U.S. 720, 47 S.Ct. 590, 71 L. Ed. 1324). Most recently in the case of England v. Louisiana State Board of Medical Examiners, D.C., 246 F.Supp. 993, affirmed 384 U.S. 885, 86 S.Ct. 1924, 16 L.Ed. 2d 998 (1965), it was held that it is not irrational and unreasonable for the Legislature of Louisiana to require chiropractors to comply with the licensing provisions of the Louisiana Medical Practice Act, supra, before being allowed to practice their profession in Louisiana. As was indicated in that case, there is no special statute covering chiropractic in Louisiana. The upshot of these decisions is to the effect that, although the laws of Louisiana do not prohibit the practice of chiropractic, nevertheless any chiropractor, in order to engage in this field must first comply with and be licensed by the Louisiana State Board of Medical Examiners. Since there is no evidence in this case that the defendants have been so licensed, nor, as aforesaid was any evidence introduced setting out the standard of care required in the practice of chiropractic, we conclude that the defendants in this case, concerning the alleged tortious act, must be judged purely and simply under the tort laws existing in Louisiana, as developed by statute and jurisprudence.
The plaintiff testified that he had been suffering from a relatively mild pain in his left shoulder and that one of his acquaintances had suggested that he seek the services of a chiropractor to gain relief therefrom, and pursuant to said suggestion, on July 26, 1966, he proceeded to the chiropratic clinic operated by defendants Edwards and Ettinger and was attended by Dr. Ettinger. Doctors Edwards and Ettinger, both chiropractors, are husband and wife. He states that upon arriving at the clinic and after explaining his difficulties to Dr. Ettinger, she caused X-rays to be taken, and thereafter positioned him on a table, and after a physical examination, the said Dr. Ettinger placed a large towel or similar looking object about his head and chin, at which time he was told to relax. Dr. Ettinger, while holding both ends of the towel, violently jerked his head, causing it to snap, with resultant extreme pain and restriction of mobility in the neck area. As a result of this manipulation he testified that he could not straighten up properly. He further stated that Dr. Ettinger, when *203 she saw the spontaneous physical incapacity that resulted from the treatment she had administered, seemed anxious for him to leave and suggested that he see a medical doctor. He returned to his place of employment and was subsequently taken to the Algiers Medical Center where he was admitted, given sedatives and placed in head-halter traction for some ten days after which time surgery was performed on his neck by Dr. Donald E. Richardson, a neurosurgeon. He remained in the hospital approximately two weeks thereafter and was unable to return to work until the latter part of October, 1966.
Plaintiff's occupation was that of a service adviser and although he was able to perform his work to some extent nevertheless he experienced restriction and pain for some time thereafter. The plaintiff presented witnesses who were fellow-employees and who testified that during the morning of July 26, 1966, the plaintiff had complained to them of a bothering or nagging sensation in the shoulder with some soreness, but of a mild nature. They knew that if his intention to seek the services of a chiropractor in connection with his complaints. They also testified that the plaintiff left his place of employment, presumably to seek the help which he had been talking about, and that after returning later that day he seemed to be in extreme pain, complained soulfully, and was severely restricted in his movements. They testified that the appearance of pain and disability was much more pronounced after he returned (supposedly from seeing a chiropractor) as compared to his condition a few hours before.
Dr. Richardson testified that he had occasion to see the plaintiff on July 26, 1966, at the hospital, and after X-rays and diagnosis, it was determined that plaintiff experienced a ruptured C-5 disc with compression of the C-6 nerve root on the left. He placed plaintiff in traction until August 5, 1966, after which time the C-5 disc was surgically removed and replaced with a bone graft from the left ilium to cause a fusion. The doctor further testified of the pain and disability which the plaintiff experienced, and was of the opinion that he would have some pain and restriction of motion on a permanent basis because of the cervical spine injury.
Concerning the feasibility of the plaintiff being injured in the fashion that he described, Dr. Richardson, upon being questioned, answered as follows:
"Q. Now, Doctor, iftaking a person who would, say, complain of a pulled muscle as a result of which they went to see a doctor, for a doctor or a chiropractor and were placed on a table and a towel placed on the back on the table and a towel were placed around the neck and then jerked, could this cause a herniated cervical disc?
"A. Well, I think if someone had a perfectly normal cervical spine if he had no disc disease at all if he was young and had a perfectly normal disc it would be somewhat difficult to do it unless you were very strong and snapped it very forcefully, but of course, it's very unusual to see anyone over the age of 20 who doesn't have some dehydration of the cartilage in the cervical disc and, of course, if a person was having neck pain when this was done it probably means he was having symptoms, mild symptoms from a disc at that time. So if he had a disc that was weak and his neck is snapped it certainly could produce rupture of a disc. If you pull under the chin this produces extension of the cervical spine and extension is one of the most difficult things, this is the most traumatic and most painful thing that you can do to someone with disc disease.
"Q. Now, if he did have some minor disc trouble would this have come *204 out in the future without some incident such as this?
"A. Possibly not, it could have, it would be difficult to say, it may or may not have. We see many people who have mild symptoms and if they are given time will graduallythese will gradually subside or become insignificant and they can go for years without having any more trouble. We don't have to operate on nearly all the patients we see with cervical disc disease. I suspect we probably have to operate on I'm sure less than ten percent of the patients who have rather marked cervical disc symptoms.
"Q. Doctor, from your operation is it possible for you to tell us whether this is a recent injury or was this a progressive disease over some years, was it possible for you to tell in such an operation as this?
"A. Well, only if the patient had secondary changes in the vertebrae, in the disc that is if on the X-ray you have collapse of the disc and marked hibernation of bone, osteophyte formations, then you could say it was there for some time, but if on the X-rays you don't see any marked changes in the bone then you really couldn't say how long it had been there. But from the operation itself you would learn no more than that, in other words, if a patient has osteophyte formations around a collapsed disc, well, you'd say it's been there at least several months or at least maybe over a year, but if the joint was still not reacted in this way you could probably say it's been there a relatively short period of time.
"Q. Well, Doctor, taking a person, say that you found in the condition that you found Mr. Edkins when you put him in traction and subsequently performed this cervical operation, would you say that person could have been in, in sports, have gone swimming, done the normal things, worked without any recurrence of pain?
"THE COURT:
"I don't quite understand your question.
"A. I don't either.
"THE COURT:
"You mean when he opened him up and looked in there?
"BY MR. GREVEMBERG:
"Q. No. Let's say the way you found Mr. Edkins, was it possible that he would have suffered considerably from this for some time prior to your seeing him?
"A. Well, at the time I saw him he was having rather severe pain and he had it for apparently a very short period of time, I don't think he could have tolerated that kind of pain over a very long period of time.
"Q. Well, now, Doctor, then if a person who is complaining, say, merely of a pulled muscle would have this happened to him where his neck is jerked back, could this cause this severe pain and difficulty which occurred in Mr. Edkins?
"A. Yes, it could have.
"Q. Well, if this person, say, in Mr. Edkins' position would he have reflected this condition for some time prior to this date, would it have beenI mean, since his pain was severe, what could bring this kind of pain on rapidly?
"A. Well, it would have to be, he was having compression of a nerve root, so whatmechanically what happens is that a piece of cartilage from the disc space had been extruded *205 from the joint, it was lodged against the nerve root and this causes fairly rapid and severe pain. I'm not sure I understand what I'm not sure I'm answering your question properly or I'm not sure what you're really asking me.
"Q. Well, what I'm trying to say is, is this something which can occur rapidly, this intense pain suffered by Mr. Edkins or is it something that builds up over a period of months or years?
"A. It can be either way, if you extrude a piece of disc material and it is lodged against the nerve root then the pain will be rather acute.
"Q. Well, what causes this extrusion?
"A. Well, the annulus of the disc ruptures and the nucleus is extruded.
"Q. What causes the rupture, Doctor?
"A. It can be from trauma, it can be if it's because the annulus is weakened or torn and the nucleus extrudes from the inside of the disc where it's being held in place.
"THE COURT:
"May I interrupt you a minute. When you went in, Doctor, to perform this operation at the C5 level I believe you saidwere you able to determine whether or not they had the osteophytes as you had said before, or what did you conclude?
"A. No, he had a piece of free fragment, a piece of cartilage that extruded from a disc.
"THE COURT:
"And without it that would lead you to believe what?
"A. That it was relatively recent.
"THE COURT:
"It was not a degenerative disc?
"A. it was not a long standing process, it was something that had happened fairly recently.
"BY MR. GREVEMBERG:
"Q. Now, Doctor, if this individual has had no complaints outside of what he termed a pulled muscle, no injury, no falling, no lifting things where he could feel something give, could it be that this pulling with a towel caused this C5 injury?
"A. Yes, it could have."
The only evidence presented by the defendant was the testimony of Dr. Ettinger. She admitted that she and the other defendant, Dr. Edwards, were husband and wife, operated the Carrollton Chiropractic Clinic, were both practicing chiropractors, and worked together in that business. Her testimony was generally to the effect that the plaintiff came into the clinic at approximately 9:15 on the morning of July 26, 1966 without a previous appointment, and that she, after receiving a case history from him, caused X-rays to be made and instructed him to return the next day. She said that she did not treat him at that time but only examined him and used a small pinwheel, an instrument which is rolled across the body to determine nerve deficiencies and that she also used a small concussion hammer for determining knee and other reflexes. She testified plaintiff was in severe pain when he first came to her office and denies using a towel or other similar type material as described by plaintiff, and likewise denied any manipulation or head jerks as plaintiff described.
The trial judge in his reasons for judgment stated as follows:
"The Court finds the following facts from the evidence:
"1. That the plaintiff did have a ruptured cervical intervertebral disc.

*206 "2. That such was caused or aggravated by the negligence of the defendant and which required subsequent surgery.
"3. Surgery was subsequently performed.
"As in most cases, there was a difference in the testimony of the parties involved and such is the case in this lawsuit. However, the Court had the opportunity to see and hear the litigants and it is our, opinion that the plaintiff has borne the burden of proving by more than a preponderance of the evidence necessary to sustain his lawsuit, that his injury or aggravation to his injury and subsequent operation to remedy this was caused by the negligence of the defendants herein."
It is evident that the trial judge believed the plaintiff and disbelieved the defendant Dr. Ettinger. Under our jurisprudence this is within the realm of his discretion and we find nothing in the record to indicate that he is manifestly erroneous in his conclusions. The only medical evidence presented was that of the neurosurgeon Dr. Richardson who made it clear that the herniated cervical disc which plaintiff experienced could have been caused or aggravated by the jerking movement of the head and neck which plaintiff described. We conclude from his expert testimony quoted hereinabove that it is not medically sound or proper to cause a snapping or jerking of the head to correct a spinal weakness and that such a manipulation could produce a ruptured disc. This being the case, such a manipulation, which was obviously shown to the satisfaction of the trial judge, is negligence of such a nature as to allow one to be compensated in damages for injuries resulting therefrom. We agree with the trial judge that the plaintiff has borne the burden of proving his case by a preponderance of the evidence in showing that the injury to his discs was caused or aggravated by the negligence of the defendant Dr. Ettinger and that the subsequent operation was necessitated by her act.
We find that the relationship among the defendants is that of an ordinary partnership. In an ordinary partnership the partners are not bound in solido for the partnership debts, each only being bound for his share thereof. The members of such a partnership are liable for the torts of one of their number, although they had no knowledge thereof, where such tort is committed in the course of the partnership business. Champagne v. Southern Farm Bureau Cas. Ins. Co., 170 So.2d 226, Fourth Circuit Court of Appeal, writs refused 247 La. 417, 171 So.2d 668. In this case the partner Dr. Ettinger is a tort-feasor and she must be held liable for the full amount of plaintiff's damages. Dr. Edwards who was not the actual tort-feasor is responsible only because he occupies the status of ordinary partner of the tort-feasor. Consequently he is not liable for the whole of the debt (damages) but only for his virile share as a partner. (Champagne v. Southern Farm Bureau Cas. Ins. Co., supra).
Although defendants-appellants suggest alternatively that the trial court award be reduced in the event that this court holds them liable, nevertheless we are of the opinion that the awards made herein are neither excessive nor inadequate and certainly not an abuse of the trial court's discretion in matters of this nature.
For the foregoing reasons the judgment of the lower court is amended so as to limit the liability of Dr. Edwards to his virile share of the partnership, and as so amended is affirmed. Costs of this appeal to be assessed against appellants.
Amended and affirmed.