AMERICAN EXPRESS INTERNATIONAL BANKING CORPORATION, Plaintiff,

v.

Habib SABET, Iradj Sabet, Hormoz Sabet and Firooz Corporation, Defendants.

79 Civ. 4203 (WCC).

United States District Court, S. D. New York.

Aug. 29, 1980.

**464**

Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiff; John F. Pritchard, David J. Long, New York City, of counsel.

Coudert Brothers, New York City, for defendants; Mark D. Lebow, J. L. Siegel, L. M. Barry, J. D. Pope, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This removed case is before the Court on the motions of plaintiff American Express International Banking Corporation ("AEIBC") to confirm the attachment order issued in state court and for summary judgment in lieu of complaint pursuant to N.Y. C.P.L.R. § 3213, and on defendants' cross-motion to vacate the attachment.

*Background*

This is an action to recover $3,232,930.14 allegedly due and owing under three promissory notes executed by defendant Habib Sabet and co-signed by defendants Hormoz and Iradj Sabet, Habib's sons, on September 26, 1977, December 9, 1977 and January 28, 1978. Plaintiff also sues on two unconditional, undated guarantees of any obliga-

tions of Habib Sabet to AEIBC executed by Habib and Iradj Sabet, and on a corporate guarantee of Habib Sabet's obligations to AEIBC executed by defendant Firooz Corporation ("Firooz") on September 12, 1977. (Firooz, an Iranian corporation, was controlled by the Sabets until its expropriation by the Islamic Provisionary Revolutionary Government of Iran in 1979.)

On July 9, 1979, plaintiff obtained an order of attachment in New York County Supreme Court pursuant to N.Y.C.P.L.R. § 6211 of the property of Habib Sabet, Iradj Sabet and Firooz Corporation, and levy was made by the Sheriffs of New York and Westchester Counties.

Defendant Habib Sabet was personally served in New York with a summons and notice of motion, as provided for in C.P.L.R. § 3213, on July 30, 1979. As discussed below, the parties have submitted conflicting affidavits with respect to personal service on defendant Hormoz Sabet. Iradj Sabet and Firooz Corporation were served on September 7, 1979 by personal delivery of the summons and notice of motion to David H. Jackman, President of the United States Corporation Company, the agent designated for service of process by Iradj and Firooz in their respective guarantees.

In August 1979, the action was removed to federal court pursuant to 28 U.S.C. § 1441. Federal jurisdiction is based on diversity of citizenship.

*Documents*

The first note in question is for the principal sum of $500,000, due August 31, 1979, with interest payable quarterly at 1¼% above the New York prime rate. The note provides, in relevant part, that:

"If at any time: (a) the Borrower defaults in the payment of any sum due to [AEIBC] or in the payment of any other indebtedness or in the performance of any agreement with [AEIBC] or of any agreement relating to indebtedness; or ... (i) the holder of this Note deems itself insecure, then, in any such event, this Note shall become immediately due and payable without presentation or demand, which are hereby expressly waived

.... This Note shall bear interest after maturity at the higher of the rate specified above or 6% per annum. The Borrower shall pay all expenses (including reasonable attorneys' fees) incurred by the holder in connection with the enforcement of any of the provisions of this Note.... If there is more than one signatory to this Note, they shall be jointly and severally liable hereon and the term 'Borrower' shall refer to any or all of the undersigned."

The second note in question is for the principal sum of $1,500,000, due and payable in six equal consecutive installments on the last day of the sixth, twelfth, eighteenth, twenty-fourth, thirtieth and thirty-fourth calendar months after December 9, 1977. Interest is payable quarterly at a rate of 1¼% above the prime rate. The note further specifies that it is issued subject to the terms of a Loan Agreement signed by Habib, Iradj and Hormoz Sabet on the same date, which, in turn, provides in relevant part that:

"1. ... The term 'Loans' as used herein shall include any and all indebtedness, obligations and liabilities of any kind of the Borrower ... in which [AEIBC] shall have any interest, now or hereafter existing ...."

\*　　\*　　\*　　\*　　\*　　\*

"2. ... In the event that (a) any sum payable upon any Loan shall not be paid when due, or (b) the Borrower shall fail to perform any agreement with [AEIBC], ... or ... (d) the financial responsibility of Borrower shall, in the sole opinion of [AEIBC], become impaired or unsatisfactory, ... then and in any such event, all Loans shall be due and payable forthwith without presentation or demand for payment, which are expressly waived, and thereafter all Loans shall bear interest at the legal rate (if higher than the rate then applicable thereto) ...."

\*　　\*　　\*　　\*　　\*　　\*

"3. ... Upon non-payment of interest or principal on any Loan when due ... (b) the Bank may without demand or

payment ... enforce, collect and realize upon any security ....

"4. The Borrower will pay all expenses (including legal fees ...) of or incidental to the enforcement of any of the provisions hereof ....

\* \* \* \* \* \*

"10. ... If more than one person signs this agreement, they shall be jointly and severally liable hereunder ...."

The Loan Agreement and second note refer also to a Pledge Agreement. Paragraph 14 of the Loan Agreement states that:

"This Agreement and the Loans due ... hereunder or under promissory notes evidencing such Loans are secured by a pledge of and security interest in certain Pledged Shares as defined in ... a Pledge Agreement, dated of even date herewith ... between the Borrower and the Bank ... as a condition precedent and prior to disbursement of any amounts of any Loan made by the Bank to the Borrower hereunder."

Two Pledge Agreements were signed on December 9, but these agreements were between two Iranian corporations controlled at that time by the Sabets, Firooz and Iramoz Corporation, respectively, and AEIBC rather than between the Sabets and AEIBC, as suggested by Paragraph 14 of the Loan Agreement. The Pledge Agreements are substantially identical: each recites that Iramoz, or Firooz, is the owner of certain shares of the Industrial and Mining Development Bank of Iran ("IMD Bank"); that:

"Mr. Habib Sabet ('Borrower') has entered into a Loan Agreement dated as of December 9, 1977 (said Loan Agreement as the same may be amended, modified or supplemented from time to time being the 'Loan Agreement'; terms defined in the Loan Agreement being used here as therein defined) with the Bank, and has executed one or more Promissory Note(s) the (the 'Note') in favor of the Bank pursuant thereto, and it is a condition to the making of the Loan by the Bank that

this Agreement be executed and delivered;"

and that:

"the Pledgor has agreed to pledge and grant a security interest (the 'Security Interest') in the pledged collateral as collateral security for all the indebtedness of the borrower under the loan agreement and the notes."

Each agreement provides that the Bank shall exercise reasonable care with respect to the pledged shares. Each corporation thereafter pledged the specified IMD Bank shares as collateral security for payment of the December 9 note signed by Habib and co-signed by Hormoz and Iradj Sabet and for any other obligation incurred under the Loan Agreement.

The third note in question covers a loan of $1,500,000, payable in six equal consecutive installments on the last day of the sixth, twelfth, eighteenth, twenty-fourth, thirtieth and thirty-fourth months after January 28, 1978. Interest is payable as in the September 26 note. The borrowers again agree to pay for costs of collection, including legal fees, if there is a default in any payment due under the note. This note, like the December 9 note, refers to the default terms and the joint and several liability of signatories terms set out in the Loan Agreement of December 9; and to certain further Pledge Agreements between AEIBC and Firooz Corporation and AEIBC and Iramoz Corporation dated January 28, 1978, covering a further pledge of additional IMD Bank shares. Two further Pledge Agreements were in fact executed by Firooz and by Iramoz Corporation on January 28. Again, each pledge is stated to be as a condition to the making of the January 28 loan to Habib Sabet under the terms of the December 9 Loan Agreement. Additional terms are substantially identical to those in the earlier Pledge Agreements. A total of 150,000 IMD Bank shares were pledged by either Firooz or Iramoz under the several Pledge Agreements.

The individual guarantees signed by Iradj and Hormoz Sabet provide, in relevant part, that:

"The undersigned in order to induce the Bank [AEIBC] ... to extend or continue the extension of credit or other financial accommodation ... to ... HABIB SABET (hereinafter called the Borrower) unconditionally guarantee[s] to the Bank payment of all liabilities of the Borrower ...

\* \* \* \* \* \*

"1. ... 'Liabilities of the Borrower' as used herein means all indebtedness ... now or hereafter existing, of the Borrower to [AEIBC] ... whether joint or several, secured or unsecured ... and whether incurred by the Borrower as principal, surety, endorser, guarantor, accommodation party or otherwise ....

\* \* \* \* \* \*

"2. ... The Bank may at any time ... without the consent of, or notice to, the undersigned, ... without impairing or releasing the obligation of the undersigned ...

"(1) change the manner, place or terms of payment ... or renew or alter any liability of the Borrower or any security therefor....;

"(2) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner ... any property securing any Liability of the Borrower; ....

"3. ... The undersigned waive(s) notice of the making or granting of any loan, extension of credit or other financial accommodation to or for the account of the Borrower, notice of any default in the payment or performance of any Liability of the Borrower and presentment, protest, notice of dishonor and demand for payment of or with respect to any Liability of the Borrower or any instrument or other writing evidencing or securing any Liability of the Borrower.

"4. ... No invalidity, irregularity or unenforceability (by reason of any bankruptcy or similar law, any law or order of any government or agency therefor purporting to reduce, amend or otherwise affect any Liability of the Borrower, or otherwise) of any Liability of the Borrower or of any security therefor shall affect, impair or be a defense to this Guaranty.

\* \* \* \* \* \*

"6. If any Liability of the Borrower is not paid when due (irrespective of whether such Liability of the Borrower became due by passage of time, acceleration or otherwise), the obligations and liability of the undersigned under this Guaranty shall immediately become due and payable, without notice or demand ....

\* \* \* \* \* \*

"15. The undersigned agree(s) that an action to enforce this Guaranty may be brought in any state or federal court of competent jurisdiction in the State of New York and hereby designate(s) United States Corporation Company, 70 Pine Street, New York, N.Y. 10005 as agent of the undersigned for the purpose of accepting service of any process within the State of New York...."

Firooz's unconditional guarantee of Habib Sabet's liabilities to AEIBC contains similar provisions as to consideration, due date, and waiver of notice, and similarly designates United States Corporation Company as agent for service of process.

A majority of the notes and other related documents were executed in New York; those documents which were not so executed were mailed from New York for execution and returned to New York by the Sabets after execution. The Loan Agreement specifically provides for payment in New York. All documents state that they are to be governed by New York law.

*Contentions*

Plaintiff contends that the interest payment due February 28, 1979 and all succeeding interest payments due on the first note have not been made, and that, accordingly, and also as a result of defendants' default on the other two notes, $500,000 in principal and $43,381.96 in interest, plus AEIBC's costs in enforcing the note, are presently due and owing. As to the second note, plaintiff contends that the interest payment due January 3, 1979, and all succeeding interest payments, have not been

made, and that, accordingly, and also as a result of defendants' default on the September 26 and January 28 notes, $1,250,000 in principal and $117,704.44 in interest, plus enforcement expenses, is due and owing. Under the January 28 note, plaintiff contends, the interest payment due February 5, 1979 and all succeeding interest payments due have not been paid, and this, along with defendants' default on the first two notes, makes the note due and payable, so that $1,250,000 in principal, $117,343.75 in interest and AEIBC's expenses are due and owing. Plaintiff also contends that, since Habib Sabet's obligations under the three notes are due and payable, the obligations of Iradj and Hormoz Sabet under their individual guarantees and of Firooz under its corporate guarantee are in effect.

Plaintiff further asserts that this Court has personal jurisdiction over all these defendants, sufficient both under New York law and under due process requirements, by virtue of both the contacts of each defendant with this jurisdiction during the course of negotiation and execution of these notes and related documents, by virtue of the parties' additional contacts with this jurisdiction, such as defendant Habib and Iradj Sabet's periodic visits to the United States for commercial purposes, Hormoz Sabet's residence in New York City, and Habib and Iradj Sabet's interest in Gulf Associates, Inc., a corporation with its principal place of business in New York City, and by virtue of Hormoz, Iradj and Firooz's naming of a New York corporation as agent for service of process in their respective guarantees.

The Sabets [1] raise three lines of defense. First, they contend that nothing is due to AEIBC from any of these defendants due to AEIBC's conduct in impairing the value of the IMD Bank shares pledged by Firooz and Iramoz under the Pledge Agreements. These defendants assert that the proceeds of the loans in question were used by Firooz Corporation, at that time controlled by the Sabets; that after the Iranian Government expropriated all the business and financial holdings of the Sabets in Iran, including

Firooz and Iramoz Corporation, and restricted transfers of currency out of Iran, further payment under the loans "became impossible"; that AEIBC had complete and unconditional power to sell or otherwise dispose of the pledged shares, subject to the provision of the Pledge Agreements requiring AEIBC to exercise reasonable care in the custody of the collateral; when Iran began to become politically unstable in December 1978, but while the Teheran Stock Exchange was still in operation, Habib Sabet instructed AEIBC to sell the IMD Bank shares pledged by Firooz and Iramoz Corporation, which sale would have generated revenue sufficient to satisfy all the Sabets' outstanding obligations to AEIBC; that Hormoz and Habib Sabet repeated these instructions to AEIBC "[o]n several occasions" in February, March and April 1979; that AEIBC did not sell the shares as instructed; and that, accordingly, AEIBC foreclosed on the collateral and accepted the pledged shares in satisfaction of the loans, or, alternatively, impaired the value of the collateral and breached its duty to exercise reasonable care with regard to the collateral under the Pledge Agreements; or, again alternatively, disposed of the collateral in a commercially unreasonable manner. The Sabet defendants state that these activities by AEIBC also give rise to a counterclaim for damages against AEIBC comparable to the amounts claimed by plaintiff here.

Secondly, the Sabet defendants suggest that the loans at issue have been paid as a result of set-off rights exercised by plaintiff following its commencement of a suit against the Government of Iran and its political subdivisions, President Carter's executive orders relating to disposition of Iranian assets held in the United States, and the United States Treasury Department's Iranian Assets Control Regulations; and, to the extent they have not been set off, may give rise to a counterclaim in favor of the Sabet defendants under N.Y. General Obligations Law § 15–103.

---

1. As discussed below, Firooz has not appeared in this action.

Finally, the Sabets assert that this Court lacks personal jurisdiction over defendants Hormoz and Iradj Sabet, since neither has been properly served with process.

*Discussion*

### 1. Habib and Iradj Sabet

The Court concludes that it has personal jurisdiction over Habib and Iradj Sabet and that plaintiff's motion for summary judgment should be granted as to those defendants.

#### a. Personal jurisdiction

██ Defendant Habib Sabet was personally served in this jurisdiction. This comports with the requirements of N.Y.C.P. L.R. § 308. Iradj Sabet was served by serving the agent designated in his guarantee agreement. This also comports with C.P.L.R. Sections 308 and 318. Both defendants have had numerous business contacts with New York relating to the negotiation, execution and repayment of these loans, making jurisdiction proper under both the transaction of business provisions of C.P.L.R. Section 302 and under the due process principles outlined in, *e. g., World-Wide Volkswagen Corporation v. Charles S. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Accordingly, the Court concludes that it has personal jurisdiction over both defendants. See *Republic National Bank v. Sabet*, 512 F.Supp. 416 (S.D.N.Y.1980) (Conner, J.).

#### b. Defenses relating to AEIBC treatment of IMD Bank Shares

The first line of defense raised by these defendants may be broken down into four arguments: first, that AEIBC's actions in failing to sell the IMD Bank shares pledged by Firooz and Iramoz after instruction by the Sabets to do so (assuming, for purposes of this motion, that such instruction was given and received) discharges defendants from any obligations on the notes under UCC Sections 3–606 and 9–207; second, that AEIBC's actions amounted to a retention of the collateral in complete satisfaction of defendants' obligations (*i. e.*, a strict foreclosure) under UCC Section 9–505(2), thus creating a complete defense to AEIBC's claim against these defendants; third, that AEIBC's treatment of the collateral was not a commercially reasonable disposition within the meaning of UCC Section 9–504(3), forming a defense and giving rise to a counterclaim in favor of defendants under UCC Section 9–507; and fourth, that AEIBC's actions were in breach of its obligations under the Pledge Agreements to exercise reasonable care in the custody of the pledged collateral. The Court finds none of these persuasive.

The first argument here rests on the following language in Section 3–606:

"(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

\*    \*    \*    \*    \*    \*

"(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

Section 9–207 defines impairment of collateral. Under that section, a secured party is required to "use reasonable care in the custody and preservation of collateral in his possession."

██ These sections have been applied to discharge a party to a loan transaction other than the party actually pledging collateral which was subsequently unjustifiably impaired, but only when the party seeking discharge was entitled to look to the collateral for reimbursement of any payment made to the creditor, either as a result of the discharged party's position with respect to the creditor—*e. g.*, as a guarantor with a right to be subrogated to the creditor's right against the collateral, see *Indianapolis Morris Plan Corp. v. Karlen*, 28 N.Y.2d 30, 319 N.Y.S.2d 831, 268 N.E.2d 632 (1971); *Mikanis Trading Corp. v. Block*, 59 A.D.2d 689, 398 N.Y.S.2d 679 (1st Dept. 1977)—or as a result of the discharged party's status as co-maker or accommodation party with respect to the owner of the collateral, entitling the discharged party to contribution or indemnification from the owner, see *Ben-*

eficial Finance Co. of New York, Inc. v. Husner, 82 Misc.2d 550, 369 N.Y.S.2d 975 (Sup.Ct. Wayne Co.1975). Habib and Iradj Sabet have no such right here, either by virtue of any direct relationship such as that of co-obligor with Firooz, or by any right to be subrogated to AEIBC's claim to the pledged shares. Thus, even assuming that the collateral here was unjustifiably impaired, these defendants should not be discharged from their direct and secondary obligations under the notes, Loan Agreement and guarantee agreement. See *Commerce National Bank v. Baron*, 336 F.Supp. 1125 (E.D.Pa.1971) (where release of collateral would have no prejudicial effect on defendant, defendant not entitled to assert Section 3–606 defense); *Beneficial Finance, supra.*

■ Similarly, these defendants may not raise those provisions of Article 9 covering disposition of collateral as a defense. UCC Section 9–105(1)(d) defines "debtor" under the article as

" . . . the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral . . . Where the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral in any provision of the Article dealing with the collateral, the obligor in any provision

dealing with the obligation, and may include both where the context so requires."

Section 9–504(3) specifies methods under which a secured party may dispose of collateral following a default.[2] Section 9–505(2) provides for a secured party's retention of collateral in satisfaction of the obligation secured.[3] Section 9–507(1) provides that:

"If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part . . . . "

Since these defendants are not owners of the collateral, and sections 9–504, 505 and 507 deal with owner's rights and creditor's obligations in connection with treatment or disposition of collateral, it does not appear that defendants are "debtors" within the meaning of Section 9–105(1)(d) for purposes of asserting the rights established by 9–504, 505 and 507. The term "debtor" has been construed to extend beyond the owner of the collateral to a non-owner obligor such

---

**2.** Section 9–504(3) provides:

"Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely

distributed standard price quotations he may buy at private sale."

**3.** Section 9–505(2) provides:

" . . . a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor and except in the case of consumer goods to any other secured party who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state. If the debtor or other person entitled to receive notification objects in writing within thirty days from the receipt of the notification or if any other secured party objects in writing within thirty days after the secured party obtains possession the secured party must dispose of the collateral under Section 9–504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation."

as a guarantor or other party with right of recourse against the collateral, or claim for contribution or reimbursement, see *Chase Manhattan Bank, N.A. v. Natarelli*, 93 Misc.2d 78, 401 N.Y.S.2d 404 (Sup.Ct. Monroe Co.1977) (guarantor's right to notice of sale under 9–504(3)); *Northern Financial Corp. v. Chatwood Coffee Shop*, 4 UCC Rep. Serv. 674 (Sup.Ct.N.Y.Co.1967) (endorser of corporate notes, claim under 9–505(2)). However, to extend the provisions of Sections 9–504, 505 and 507 to cover a party whose obligations are wholly independent from those of the pledgor providing the collateral at issue, and who has no right of recourse against the collateral either via subrogation or under a claim for contribution or reimbursement from a co-obligor, see discussion *supra*, goes far beyond the holding in *Chase* and makes little commercial sense in the context of this transaction, where Firooz is a corporate entity distinct from the Sabets and in effect acted as an accommodation party for the Sabets, rather than vice versa.

■ ·Nor have these defendants come forward with any facts under which the Court could find that defendants had a right to assert AEIBC's obligation under its Pledge Agreements with Firooz and Iramoz Corporation—agreements to which, the Court notes, defendants were not parties—as a defense to this action. In particular, as to a possible third-party beneficiary theory, the documents and affidavits indicate that the loan transactions were made for the benefit of Firooz, not the Sabets.

### c. Setoff

The second line of defense—the asserted setoff of Iranian assets against this claim—is without merit in this case for the reasons stated in this Court's opinion in *Republic National Bank, supra* : there is here, as in *Republic*, no finality to the setoff and no showing that AEIBC will in fact be able to recover any of the frozen Iranian assets in light of the sizeable claims currently pending against such funds.

### 2. Hormoz Sabet

The discussion as to defendants Habib and Iradj Sabet applies with equal force to defendant Hormoz, and would lead to a similar ruling were it not for a dispute as to whether Hormoz was personally served in this action. Hormoz Sabet states in his affidavit of September 25, 1979 that:

> "AMEX has not made personal service upon me, at my home, my office or elsewhere, of any summons, motion papers, or other documents in this action, either while the action was pending in the Supreme Court of the State of New York, or following the removal of this action to the United States District Court for the Southern District of New York on August 10, 1979."

In opposition, AEIBC offers the affidavit of Carl Kornbluth stating that on August 3, 1979, at 2:55 P.M., at 30 Rockefeller Center, he personally served Hormoz Sabet, who is described in the affidavit as a male with black hair, approximately 42 years of age, 5′11″, 160 pounds.

Since this conflict may be due to Hormoz Sabet's failure to recall service in this action, the Court directs that Hormoz Sabet submit a further sworn affidavit expressly addressing the allegations set forth in the affidavit of Carl Kornbluth. If no such affidavit is submitted within 15 days of the date of this Opinion and Order, the Court will direct the entry of summary judgment against Hormoz Sabet. If such an affidavit is submitted contradicting the process-server's affidavit, the case will be referred to a magistrate for a hearing on this issue.

### 3. Firooz Corporation

For the reasons stated in this Court's Opinion and Order in *Republic, supra*, it does not appear that service on the agent designated in the Firooz guarantee may be sufficient to reach the new management of Firooz. Firooz has not, in fact, appeared. Accordingly, plaintiff shall serve Firooz in accordance with the procedures outlined by Judge Duffy in the consolidated Iranian cases in this District, see *New England Merchants National Bank v. Iran Power Generation and Transmission Co.*, 508 F.Supp. 49 (S.D.N.Y.1980).

If no answering papers or other response from Firooz are received within 60 days of the date of service by the method outlined in Judge Duffy's Opinion, a default judgment will be entered against defendant Firooz.

*Summary*

Plaintiff's motion for summary judgment is granted as to defendants Habib and Iradj Sabet.

Plaintiff's motion for summary judgment will be granted as to defendant Hormoz Sabet unless within 15 days of the date of this Opinion and Order Hormoz Sabet submits an affidavit as indicated above.

As plaintiff has amply shown probability of success on the merits, plaintiff shall submit an order confirming the order of attachment and providing for entry of partial summary judgment pursuant to Rule 54(b), F.R.Civ.P., in accordance with this Opinion and Order.

As to the remaining cause of action against Firooz Corporation, the case will be placed on the Suspense docket pending service on Firooz by the method suggested above.

SO ORDERED.