FEDERAL DEPOSIT INSURANCE
CORPORATION, Appellee,

v.

BLUE ROCK SHOPPING CENTER,
INC., A Delaware Corporation.

Appeal of Max AMBACH and
Rose Ambach.

No. 83–1862.

United States Court of Appeals,
Third Circuit.

Argued July 16, 1984.

Decided June 19, 1985.

Donald J. Wolfe, Jr., Gregory A. Inskip (Argued), Potter Anderson & Corroon, Wilmington, Del., for appellee; Lawrence F. Bates, Federal Deposit Ins. Corp., Washington, D.C., of counsel.

John E. Babiarz, Jr. (Argued), Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for appellants.

Before ADAMS and BECKER, Circuit Judges and O'NEILL, District Judge.*

## OPINION OF THE COURT

O'NEILL, District Judge.

Federal Deposit Insurance Corporation has brought this action on a note against Blue Rock Shopping Center, Inc., Max Ambach and his wife Rose Ambach. The district court granted summary judgment to plaintiff. 567 F.Supp. 952 (1983).

■ Summary judgment is, of course, proper only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Moreover, the inferences drawn from the evidence submitted to the trial court must be viewed in the light most favorable to the party opposing the motion. On review, this Court is required to apply the same test the district court should have used. *Hollinger v. Wagner Mining*

*Equipment Corp.*, 667 F.2d 402, 405 (3d Cir.1981).

Viewed most favorably to defendants, the facts may be summarized as follows. On September 29, 1966, in return for a loan by Farmers Bank of the State of Delaware in the amount of $800,000, Blue Rock, by its President, Mr. Ambach, executed a Bond and Warrant in which it promised to pay Farmers $800,000 plus annual interest of 6.25 percent. The Bond was secured by a first mortgage on real estate owned by Blue Rock and located in Blue Rock Shopping Center, Wilmington, Delaware. As additional collateral, Blue Rock assigned to Farmers its interest in a lease of a warehouse located on the real estate. The payments to be made by the lessee, A.T.C. of Wilmington, Inc., which were assigned to Farmers, coincided with Blue Rock's installment obligations to Farmers under the Bond. Payment of the rent was guaranteed by Atlantic Thrift Centers, Inc., and ultimately by Arlen Realty and Development Corporation, its corporate successor.

Settlement of the transaction was held on September 29, 1966, the day that the Bond and Assignment of Lease were signed. These documents and others were delivered to Farmers, and the proceeds were disbursed.[1] Two letters were exchanged. Farmers' letter to the attorney for Blue Rock stated:

"P.S. the $800,000 Bond and Warrant is to be signed by Max Ambach and his wife, Rose."

The attorney's letter to Farmers said:

"I understand that it is your desire to have Max Ambach and Rose Ambach, his wife, individually sign the corporate bond and warrant, and consequently, I have prepared a new such bond and warrant and have forwarded it to Mrs. Ambach today for signature. When returned to me, I will then substitute this bond and

---

* Honorable Thomas N. O'Neill, Jr., United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. After satisfaction of a previously existing mortgage of Blue Rock to Farmers and discharge of other corporate obligations. Blue Rock received new proceeds of approximately $50,000 from the loan.

warrant for the one which you presently possess."

Since the Bond sued upon is dated September, 1966, and is signed by all defendants, it is apparent that the contemplated substitution occurred.[2] The individual defendants did not receive any of the borrowed funds.

In July, 1975, Blue Rock defaulted on its obligations to Farmers. Its default was caused by the concomitant default of ATC and Arlen, who had discontinued operations at the Shopping Center. Farmers declined Blue Rock's request that it agree to a settlement proposal made by Arlen, which offered to pay $100,000 for the immediate termination of the lease and an additional $24,000 if the premises were not relet within a year. At the time of this request, approximately $428,000 remained due from Arlen on its guaranty of the lease. Instead, Farmers and Blue Rock executed a letter agreement in which Blue Rock assigned to Farmers all of its interest in the Arlen guaranty in consideration of Farmers' refraining from enforcement of its rights against Blue Rock arising out of the default.[3] Thereafter, in March, 1976, Farmers sued Arlen on the guaranty in the Delaware Superior Court.

On October 25, 1976, pursuant to an Assistance Agreement previously made between FDIC and Farmers, Farmers assigned to FDIC all of its interest in the Bond and Mortgage, the Assignment of Lease, and the guaranty of the lease payments.

In January, 1980, the Shopping Center was sold for $325,000 at a sheriff's sale which occurred because taxes due to the City of Wilmington had not been paid. FDIC received $188,115.33 from the proceeds of the sale, which was applied to the amount owing on the Bond. On November 12, 1982, without the consent of defendants, FDIC settled its Superior Court action against Arlen for the sum of $148,467. As a result, as of October 22, 1982, there was a deficiency balance of $523,105.71 plus interest. This suit seeks to collect the remaining debt.

The district court granted summary judgment to plaintiff and dismissed defendants' affirmative defense which asserted that FDIC's unreasonable delay in prosecuting the claim against Arlen and its unilateral settlement of the suit against Arlen constitute an impermissible impairment of collateral barring recovery in this action. The district court held that: (1) as a matter of Delaware law, section 3–606(1)(b) of the Uniform Commercial Code does not operate to discharge a co-maker of a note, as opposed to an accommodation maker; (2) because defendants do not rely upon any written agreements to prove that the Ambachs acted as accommodation makers, the FDIC should be considered a holder in due course under 12 U.S.C. § 1823(e) and any parol evidence tending to establish the Ambachs as accommodation makers would be barred; and (3) Max and Rose Ambach are co-makers, not accommodation makers, and are not discharged by virtue of section 3–606(1)(b).

The question to be resolved on this appeal is whether a co-maker of a negotiable instrument is entitled to assert the defense of unjustifiable impairment of collateral as provided by section 3–606(1)(b) of the Uniform Commercial Code. Since we hold that a co-maker with a right of recourse may assert the defense, we also will comment on the extent to which 12 U.S.C. § 1823(e) limits the evidence which the individual defendants may offer on remand.

## I.

▪ The parties, the district court and this panel on its previous remand have all assumed, incorrectly, that the Uniform Commercial Code as enacted in Delaware determines whether a co-maker may assert the defense of unjustified impairment of collateral. Since the Supreme Court of

---

**2.** No date in September is filled in above the signatures on the Bond. The signers bound themselves "jointly and severally."

**3.** Farmers reserved all of its rights including its right to proceed against the collateral.

Delaware has not resolved this issue, the case thus far has been concerned with a prediction as to how that Court would decide were it confronted with the problem. *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661–62 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980).

Jurisdiction of this action is not, however, based on diversity of citizenship but on 28 U.S.C. § 1345 and 12 U.S.C. § 1819. The first of these provisions confers upon the district courts jurisdiction of all civil actions commenced by the United States or any agency thereof expressly authorized to sue by Act of Congress. The second provision, derived from the statute which created FDIC, provides in part:

Upon June 16, 1933, the Corporation shall become a body corporate and as such shall have power—

\* \* \* \* \* \*

Fourth. To sue and be sued, complain and defend, in any court of law or equity, State or Federal. All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy....[4]

This action has been brought by FDIC in its corporate capacity. Accordingly, the suit arises under the laws of the United States and we are to apply federal law. *D'Oench, Duhme & Co., Inc. v. F.D.I.C.*, 315 U.S. 447, 455–456, 62 S.Ct. 676, 678, 86 L.Ed. 956 (1942).

While it is evident that federal law must supply the rule of decision, we must next determine whether to turn to federal common law or state law for guidance. The leading Supreme Court case interpreting the FDIC Act counsels us to turn to federal common law for guidance. In his concurrence in *D'Oench, Duhme & Co., Inc. v. F.D.I.C.*, 315 U.S. at 467–468, 62 S.Ct. at 683–684, Justice Jackson concluded that federal common law should supply the rule of decision in civil actions such as this one. His conclusion was based on his interpretation of the language of 12 U.S.C. § 1819 and a prior version of the Act. The Act in effect at the time of *D'Oench, Duhme* provided in § 1819 that "[a]ll suits of civil nature ... shall be deemed to arise under the laws the United States" and provided in another section that the FDIC may sue or be sued in any state or federal court of law or equity. Justice Jackson reasoned that § 1819 is not "merely jurisdictional" because of the presence of the separate jurisdictional section, *id.* at 467–68, 62 S.Ct. at 683–84, and concluded that the Court should turn to federal common law for guidance. The United States Court of Appeals for the First Circuit followed this reasoning in *Santoni v. Federal Deposit Ins. Corp.*, 677 F.2d 174, 178 (1st Cir.1982) and found that Justice Jackson's analysis is further supported by a 1969 amendment to § 1819 adding that "the United States Courts shall have original jurisdiction" over cases involving the FDIC. *Id.* at 177.

We would also be compelled to turn to federal common law for guidance if we followed other courts[5] and applied the *Kimbell Foods*,[6] test to determine whether federal common law is the source of the appropriate rule of decision. In *Kimbell*

---

**4.** This provision excludes "any such suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State bank under State law...." 12 U.S.C. § 1819. In this matter, FDIC is not acting in the capacity of a receiver of a state bank.

**5.** *See F.D.I.C. v. Wood*, 758 F.2d 156, 159–162 (6th Cir. 1985) (applying federal common law); *Gunter v. Hutcheson*, 674 F.2d 862, 869 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (applying federal common law); *F.D.I.C. v. Rodenberg*, 571 F.Supp. 455, 459–60 (D.Md.1983) (applying federal common law). *Cf. F.D.I.C. v. Bank of America*, 701 F.2d 831, 834 (9th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983) (applying state law).

**6.** *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979).

*Foods,*[7] the Supreme Court identified three factors governing this determination: first, whether the nature of the federal program requires national uniformity; second, whether the application of state law would frustrate specific objectives of the federal program; and third, whether the application of federal law would disrupt commercial relationships predicated on state law. *Id.,* 440 U.S. at 728–29, 99 S.Ct. at 1458–59. The substantive issue which we are being asked to resolve is whether a co-maker of a negotiable instrument is entitled to assert the defense of unjustifiable impairment of collateral against the holder of the note, the FDIC. *Kimbell Foods* directs us to consider the application of state law or federal common law to that issue in light of the federal policy animating the creation of the FDIC. By a 1933 amendment to the Federal Reserve Act of 1913,[8] Congress created the FDIC "to promote the stability of the banking system by preventing runs on banks by depositors and keeping open the channels of trade and commercial exchange." *FDIC v. Harrison,* 735 F.2d 408, 413 (11th Cir.1984). FDIC insures bank deposits; as an insurer one of its primary duties is to pay the depositors of a failed bank. In the course of fulfilling this duty, FDIC frequently purchases the assets of a failed bank and then attempts to collect on them in order to minimize the loss to the insurance fund.[9]

With respect to the first and second factors of the *Kimbell Foods* test, national uniformity is important to permit the FDIC to promote the stability of and confidence in our nation's banking system. "[H]olding the FDIC to different standards of care in different states would frustrate its attempts to promote the stability of, and confidence in, the nation's banking system." *F.D.I.C. v. Rodenberg,* 571 F.Supp. 455, 460 (D.Md.1983).

With respect to the third factor, the application of federal law would not disrupt commercial relationships predicated on state law. It may be that the Ambachs, Blue Rock and Farmers Bank entered into their agreement with the understanding that Delaware law would govern any dispute arising therefrom because they are all from Delaware, and the loan was made and the real estate is located there. The issue here, however, does not involve a dispute among these parties, but instead involves the ability of a co-maker to raise the unjustifiable impairment of collateral defense against the FDIC. There is no reason to believe that as to that question any of the parties to the transaction predicated their behavior upon state law.

Accordingly, we will turn to federal common law to supply the rules of decision. In so doing, we are required to fashion rules of decision which effectuate the federal policy expressed or implicit in the FDIC statute, but may consider state precedents and use them "interstitially"[10] where a federal answer has not been provided. *D'Oench, Duhme & Co., Inc. v. F.D.I.C.,* 315 U.S. at 471–75, 62 S.Ct. at 685–88. Because this appeal involves an interpretation of commercial paper law, it is appropri-

**7.** We note that *Kimbell Foods,* which ultimately turned to state law for guidance, differs from this case in two important respects. First, jurisdiction over the Small Business Administration controversy in *Kimbell Foods* was based on *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), not on an explicit grant of jurisdiction by Congress. Under the FDIC Act, Congress explicitly provided in § 1819 for federal jurisdiction. Second, the FDIC Act states in § 1819 that civil suits "arise under the laws of the United States," while the SBA Act in *Kimbell Foods* contains no similar provision.

**8.** Act of June 16, 1933, ch. 89, § 8, 48 Stat. 168, adding Section 12B to the Federal Reserve Act,

ch. 6, 38 Stat. 648 (December 23, 1913), codified at 12 U.S.C. § 264. In the Federal Deposit Insurance Act, ch. 967, 64 Stat. 873 (September 21, 1950), Congress withdrew section 12B from the Federal Reserve Act and made a separate provision for the FDIC, now codified at 12 U.S.C. § 1811 *et seq.*

**9.** *See* discussion in *Gunter v. Hutcheson,* 674 F.2d 862, 865–866 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

**10.** *Cf. Southern Pacific Co. v. Jensen,* 244 U.S. 205, 221, 37 S.Ct. 524, 61 L.Ed. 1068 (1917) (Holmes, J., dissenting) (admiralty and maritime common law).

ate for us to turn to Article 3 of the Model Uniform Commercial Code for guidance. *See United States v. Unum*, 658 F.2d 300, 304 (5th Cir.1981).[11] Like the *Unum* court, we will "follow the model UCC and those cases which best supplement the UCC and further its purposes and design." 658 F.2d at 304, n. 2.

## II.

■ Section 3–606(1) of the Uniform Commercial Code provides that "[t]he holder discharges any party to the instrument to the extent that without such party's consent the holder ... (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

This language extends the protection of the statute to "any party to the instrument." Nevertheless, there is a division of authority as to whether 3–606 operates to discharge a maker of a note. Some courts have concluded that the statute must be read literally and that the words "any party" clearly include a maker or co-maker:

There is a split of authority in other jurisdictions as to whether a maker of a note is discharged by the holder's impairment of collateral.... We are impressed with the clear and unambiguous language used in the statute in providing that any party to the instrument is discharged to the extent the holder unjustifiably impairs any collateral. The plain meaning of the phrase 'any party' clearly would include a co-maker. No one can deny that a co-maker is a party to the instrument. Many times we are called upon to construe ambiguous provisions in the statutes and in doing so we must employ various rules of construction to arrive at the meaning of the words used. But unless we are faced with some ambiguity we should give words their plain

meaning and stop there. We believe this is such a case.

*Southwest Florida Production Credit Assn. v. Schirow*, 388 So.2d 338, 339 (Fla. App.1980) (citations omitted).

Other courts look to the policy which the defense is designed to serve and reason as follows:

At first blush, this section appears to provide a defense. However, a maker of a note, as opposed to a surety, is not entitled to invoke this defense....

This interpretation of 3–606 is soundly based. The maker of a note is always primarily responsible for the debt with no recourse except against co-makers. Sureties, whether accommodation makers or endorsers ... retain a right of recourse against the primary obligor.... Fairness dictates that if the risk a surety has agreed to undertake is increased through the impairment of the securing collateral by the person to whom payment is due, the surety should be discharged to the extent of impairment.

*United States v. Unum*, 658 F.2d at 304–305 (citations omitted).

The district court adopted the reasoning of the *Unum* Court and similar state decisions, which it regarded as the majority view, and held that "Section 3–606 does not operate to discharge a co-maker on a note, as opposed to an accommodation maker." We agree with the *Unum* Court that 3–606 is meant to apply only to parties who act as sureties. We hold, however, that a co-maker who signs a note to accommodate the primary obligor and who has a right of recourse against the primary obligor is a surety who can assert the defense of 3–606(1)(b).

Section 3–606 of the Code is derived from section 120 of the Uniform Negotiable Instruments Law, which provided for discharge, in certain circumstances, of "a person secondarily liable on the instrument...."[12] The Comment to the Code

---

**11.** The *Unum* court relied on *Clearfield Trust Co. v. U.S.*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), rather than on any explicit statutory directive to apply federal law.

**12.** "§ 120. When Persons Secondarily Liable On; Discharged.—A person secondarily liable on the instrument is discharged:

explains the nature and purposes of the change as follows:

Sec. 3–606.1.  Draftsmen's Comment.

Prior Uniform Statutory Provision: Section 120, Uniform Negotiable Instruments Law.

Changes: reworded; new provisions.

Purposes of Changes and New Matter. To make it clear that:

1.  The words 'any party to the instrument' remove an uncertainty arising under the original section.  The suretyship defenses here provided are not limited to parties who are secondarily liable,' but are available to any party who is in the position of a surety, having a right of recourse either on the instrument or dehors it, including an accommodation maker or acceptor known to the holder to be so. . . .

> (1) By an act which discharges the instrument:
> (2) By the intentional cancellation of his signature by the holder;
> (3) By the discharge of a prior party;
> (4) By a valid tender of payment made by a prior party;
> (5) By a release of the principal debtor, unless the holder's right of recourse against the party secondarily liable is expressly reserved;
> (6) By any agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent of the party secondarily liable, or unless the right of recourse against such party is expressly reserved.

13.  "An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it." U.C.C. § 3–415(1).

14.  *See* White & Summers, *Uniform Commercial Code* § 13–12 at 516–17:

> One with money to lend . . . may have doubts about a prospective debtor's ability to pay.  In such cases he is likely to demand more assurance than the debtor's bare promise of payment.  The prospective creditor can reduce his risk by requiring some sort of security.  One . . . type of security takes the form of joining a third person on the debtor's obligation.  A third party who thus obligates himself to answer for the debt or default of the debtor is called a surety.
> Structurally, suretyship is a three party relationship involving the creditor, the principal debtor and the surety.  The debtor's obli-

5.  Paragraph (b) of subsection (1) is new.  The suretyship defense stated has been generally recognized as available to indorsers or accommodation parties. . . .

It is evident from this Comment and the prior law that the draftsman of the Code used the words "any party" in place of "persons secondarily liable" to make it clear that the newly codified defense of 3–606(1)(b) would be available to any party to the instrument who is in the position of a surety with a right of recourse.  As under § 120 of the N.I.L., this party can be one who is "secondarily liable" such as an indorser.  Now, however, any accommodation party, including a co-maker who has a right of recourse against the maker who posted the collateral, may claim the suretyship defenses of 3–606 [13] even though the co-maker possessing that right is jointly and severally liable to the holder on the note.[14]

> gation as a borrower of money is already familiar.  So, too, his obligation as a signer of a negotiable instrument.  The surety's obligation is somewhat different.  In effect the surety undertakes to 'back up' the performance of the debtor and he thereby gives the creditor the added assurance of having another party to the obligation.  It is common practice for a surety to appear on a note either as a co-maker or as an indorser.  Assume for example that a father is going to be the surety on his son's contract to pay for a new car.  The father may sign the note as co-maker or he may simply indorse the note.  As we will see, in either case he is what the Code calls an 'accommodation party' and owes the holder of the note the obligation of a maker, or of an indorser as the case may be (although he will have certain defenses not normally available to makers or indorsers against all but holders in due course without notice of his accommodation status.)
> As between the surety and the debtor, it is clear that the debtor has the primary obligation to pay the debt.  Since the creditor is entitled to only one performance and the debtor receives the benefit of the transaction, the surety's obligation is undertaken with the expectation that the debtor will meet his commitment to the creditor.  Thus if the surety is made to pay his principal's debt, he has the right to recover from the principal.  If the creditor releases the principal debtor and so deprives the surety of the right to recover from the principal by being subrogated to the creditor's rights, or if the creditor fails to perfect a security interest in collateral given

This analysis is supported by *American Express Internat'l Banking Corp. v. Sabet*, 512 F.Supp. 463 (S.D.N.Y.1980), decided under New York's enactment of the Code, in which the Court said:

> These sections [3–606 and 9–207] defining impairment of collateral have been applied to discharge a party to a loan transaction other than the party actually pledging collateral which was subsequently unjustifiably impaired, but only when the party seeking discharge was entitled to look to the collateral for reimbursement of any payment made to the creditor, either as a result of the discharged party's position with respect to the creditor—e.g., as a guarantor with a right to be subrogated to the creditor's right against the collateral ... or as a result of the discharged party's status as co-maker or accommodation party with respect to the owner of the collateral, entitling the discharged party to contribution or indemnification from the owner....

*Id.* at 469–70 (citations omitted).

One of the authorities cited in *American Express* was *Indianapolis Morris Plan Corp. v. Karlen*, 28 N.Y.2d 30, 34, 319 N.Y.S.2d 831, 834, 268 N.E.2d 632, 634 (1971), in which the Court of Appeals of New York, per Breitel, J., noted that 3–606 differs from the N.I.L. in that it refers to any party on the instrument and not merely to persons secondarily liable, and recognized that 3–606 was available to individual defendants who were co-makers of a note with a corporation.[15] In that case, it was not disputed that the corporation was the borrower and that only the form of the note made the individual defendants co-makers.[16]

In light of the above analysis, we conclude that if the individual defendants were co-makers with a right of recourse they may assert the defense provided in 3–606(1)(b) of the Code.

■ With respect to the corporate defendant, we reach a different conclusion. Since the words "any party" read literally include Blue Rock, the question is not free from doubt. We are persuaded, however, by the Draftsmen's Comment to the Code and the reasoning in *Unum* and *American Express* that, absent a contrary provision, the primary obligor as among co-makers, *i.e.*, the one who posted the collateral and received the proceeds of the loan and who therefore is not a surety, remains liable to the holder for the debt incurred regardless of any impairment of collateral by the holder.

We believe that these conclusions conform to the clearly expressed intent and policy of the Code to protect any party to an instrument who is in the position of a surety with a right of recourse, but not a party who does not occupy such a position. Our conclusions require a remand for an evidentiary hearing with respect to whether the Ambachs were sureties with a right of recourse, and if they were whether they can prove that FDIC unjustifiably impaired the collateral securing the Bond.

## III.

■ In the district court, the Ambachs contended that they were accommodation makers. The court recognized that this was a factual question and held that parol evidence would not be barred under the UCC because the FDIC was not a holder in

---

by the debtor and so is unable to recover his debt out of the collateral, the surety's burden will be increased. The law assumes that the surety has not assented to such increased burdens. Consequently the law has traditionally held that conduct by the creditor which increases the surety's risk discharges the surety.

**15.** The *Karlen* Court held, however, that defendants had waived their rights under 3–606.

**16.** *American Express* also cited *Beneficial Finance Co. of N.Y. v. Husner*, 82 Misc.2d 550, 369 N.Y.S.2d 975 (N.Y.Sup.Ct.1975), which held that the right of one co-obligor on a note to contribution from another co-obligor, who owned the collateral pledged as security for the note, was a right of recourse within the meaning of 3–606 of the Code.

due course;[17] however, the court also held that 12 U.S.C. § 1823(e) barred the Ambachs from offering such evidence to prove that they were accommodation makers. Since the case is to be remanded for an evidentiary hearing, it may be helpful to express some views on the effect of § 1823(e) upon the evidence which may be offered at that hearing.

We have noted that in the course of fulfilling its duty to pay the depositors of a failed bank, FDIC frequently purchases the assets of the failed bank and then attempts to collect on them in order to minimize the loss to the insurance fund.[18] Not unexpectedly, FDIC's attempts to realize on such assets have been met by defenses which the obligor on the note has against the failed bank. In the leading case, *D'Oench, Duhme & Co., Inc. v. F.D.I.C.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the maker alleged that at the time the note was given an oral agreement was made with the bank that the bank would not enforce it.[19] Relying on a criminal provision of the Federal Reserve Act, Section 12(b)(s), 12 U.S.C. § 264(a)[20] and another section of the Act,[21] the Court found "a federal policy to protect respondent [FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which respondent insured or to which it makes loans." 315 U.S. at 457, 62 S.Ct. at 678. The Court further held that federal policy requires the protection of the FDIC against such secret agreements whether or not the obligor and the bank had arranged to use the note for the purpose of deceiving the FDIC. In a concurring opinion, Justice Jackson emphasized that generally "[t]he corporation would succeed only to the rights which the bank itself acquired where ordinary and good-faith commercial transactions are involved. But petitioners' conduct here was not intended to confer any right on the bank itself, for as to it the note was agreed to be a nullity." 315 U.Ɔ. at 474, 62 S.Ct. at 687. *See also F.D.I.C. v. Alker*, 151 F.2d 907 (3d Cir.1945), *cert. denied*, 327 U.S. 799, 66 S.Ct. 901, 90 L.Ed. 1025 (1946) (following *D'Oench, Duhme*).

The Federal Deposit Insurance Act, enacted in 1950, transferred the provisions relating to the FDIC from the Federal Reserve Act, Section 12B, to 12 U.S.C. § 1811 *et seq.*,[22] and enacted a new provision, 12 U.S.C. § 1823(e), which provides, in part:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation [FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been adopted by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

The statute makes ineffective, as against the FDIC, any *"agreement* which tends to

---

**17.** The district court found that FDIC was not a holder in due course because the note was overdue when acquired by FDIC. UCC § 3–302(1)(c).

**18.** *See* note 9, *supra*, and accompanying text.

**19.** The receipt for the note contained the statement: "This note is given with the understanding it will not be called for payment. All interest payments to be repaid." 315 U.S. at 454, 62 S.Ct. at 678.

**20.** "Whoever, for the purpose of obtaining any loan from the Corporation ... or for the purpose of influencing in any way the action of the Corporation under this section, makes any statement, knowing it to be false, or willfully overvalues any security, shall be punished by a fine of not more than $5,000, or by imprisonment for not more than two years, or both."

**21.** 12 U.S.C. § 264(y) (superseded).

**22.** The criminal provision relied on in *D'Oench, Duhme*, 12 U.S.C. § 264(s), was transferred to the criminal code, 18 U.S.C. § 1007.

diminish or defeat the right, title or interest of ... [FDIC] in any asset acquired by it ..." (emphasis supplied) and which is not embodied in a writing conforming to the requirements of the statute. Thus, by its terms [23] the statute protects the FDIC only against agreements not satisfying its requirements.[24] As the Court of Appeals for the Eleventh Circuit has observed, "the common thread running through [most of the cases decided under the statute] has been the assertion by the obligor that an oral side agreement with the bank controlled the rights of the parties." [25]

Section 1823(e) does not, however, protect FDIC against all defenses. We have found nothing to demonstrate that the section was designed to protect the FDIC against the consequences of its own conduct with respect to the asset after acquiring it, which is the present situation. *See FDIC v. Harrison,* 735 F.2d at 412 (11th Cir.1984) (FDIC subject to defense of equitable estoppel arising from acts and representations of FDIC agents). In other instances where "the parties contend that no asset exists or an asset is invalid *and* that such invalidity is caused by the acts independent of any understanding or side agreement," § 1823(e) has not been applied to bar such defenses. *FDIC v. Merchants Nat. Bank of Mobile,* 725 F.2d 634, 639 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984), citing *Gunter, supra,* and *Howell v. Continental Credit Corp.,* 655 F.2d 743, 746–48 (7th Cir.1981); *Riverside Park Realty Co. v. FDIC,* 465 F.Supp. 305, 312–13 (M.D.Tenn. 1978).

While research discloses a dearth of legislative history on this provision, this interpretation of § 1823(e) is consistent with the language of § 1823(e) and the reasonable inference that a purpose of the section was to codify the rule of *D'Oench, Duhme.*[26]

At this point, we do not know whether the Ambachs will offer any agreement not

---

**23.** "The starting point in every case involving construction of a statute is the language itself." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) *quoting Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring).

**24.** *F.D.I.C. v. Gulf Life Ins. Co.,* 737 F.2d 1513, 1516 (11th Cir.1984).

**25.** *Gunter v. Hutcheson,* 674 F.2d 862, 867 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982):

In *Black v. FDIC,* 640 F.2d 699 (5th Cir.), *cert. denied,* 454 U.S. 838, 102 S.Ct. 143, 70 L.Ed.2d 119 (1981), for example, the obligor attempted to prove that a real estate development loan agreement with a bank included the unwritten understanding to make construction loans on certain real estate. The court held that the unwritten agreement could not be asserted against the FDIC. Similar situations occurred in *FDIC v. Lattimore Land Corp.,* 656 F.2d 139 (5th Cir.1981) (oral agreement to make future loans), *Charles Ventures, Inc. v. FDIC,* 651 F.2d 355 (5th Cir.1981) (assertion that the bank breached joint-venture agreement), and *FDIC v. Hoover-Morris Enterprises,* 642 F.2d 785 (5th Cir.1981) (obligor asserted that bank had agreed to take a deed in satisfaction of the debt.)

**26.** Howell v. Continental Credit Corp., 655 F.2d at 746 (7th Cir.1981) ("Congress codified the rationale of D'Oench, Duhme in 12 U.S.C. § 1823(e)....").

The only comment on the purpose of § 1823(e) which the court has located is the following statement on the floor of the House of Representatives:

Mr. WALTER, Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. Walter: On page 49, line 9, after 'obligor', strike out 'simultaneously' and insert 'contemporaneously.'

"Mr. WALTER. Mr. Chairman, under section 13(e) of this measure [1823(e) ] as amended certain conditions for the first time are imposed upon a bank in the event agreements are entered into between customers of the bank and the bank. *Prior hereto and up to the time of an unfortunate interpretation of the law it was believed that all legal agreements entered into by the bank and obligor were binding on the Corporation.* Under the language of the bill, this agreement must be entered into simultaneously with the recording and other conditions. It is quite obvious that is impossible. Bank directors usually meet once a week. In the smaller banks there are no loan committees. This language contemplates that when these agreements are entered into they may be approved contemporaneously, which, of course, means at a time approximating when they were entered into." (Emphasis supplied).

96 Cong.Rec. 10,731 (1950).

conforming to the requirements of § 1823(e) to prove that they were co-makers with a right of recourse. Certainly, § 1823(e) would preclude evidence of an agreement that the Ambachs were not liable jointly or severally on the note or that Blue Rock did not have the right to pledge the collateral as security for the obligation to Farmers. However, in § 1823(e), Congress did not intend, nor did the Supreme Court in *D'Oench, Duhme*, to encompass agreements as remote as an agreement between a principal and a surety as to recourse, even though the status established by such an agreement might affect the ability of someone ultimately found liable to the FDIC as an accommodation maker to assert the § 3–606 defense. Section 1823(e) is directed at agreements between a bank and its obligor showing or attempting to show that the obligation was illusory or conditional. We do not believe that Congress intended, even by language which speaks of "diminishing or defeating" the title of FDIC, to extend § 1823(e) to cover agreements between the Ambachs and the corporation relative to the Ambachs' status.

## IV.

The judgment of the district court against Blue Rock Shopping Center, Inc. will be affirmed. The judgment against Max Ambach and Rose Ambach will be vacated and the case will be remanded for further proceedings consistent with this opinion.