## FEDERAL SAVING AND LOAN INSURANCE CORP., etc.,

v.

## McGINNIS, JUBAN, BEVAN, MULLINS & PATTERSON, P.C., et al.

No. 89–327.

United States District Court, E.D. Louisiana.

July 13, 1992.

---

5. *See* n. 1.

James A. Brown, Liskow & Lewis, New Orleans, LA, for plaintiffs.

Timothy E. Kelly, H. Alston Johnson, III, Phelps, Dunbar, Marks, Claverie & Sims, Baton Rouge, LA, Donald A. Hammett, John V. Baus, Jr., New Orleans, LA, Donald S. Zuber, Seale, Smith, Zuber & Barnette, Baton Rouge, LA, for defendants.

## ORDER AND REASONS

FELDMAN, District Judge.[*]

Before the Court are several motions. Defendant moves for summary judgment: (1) dismissing some of the FDIC's malpractice claims because the alleged negligence acts were not done in the course of a duty owed to the failed institution, (2) dismissing the FDIC's conflict of interest claims, (3) dismissing all the FDIC's claims because the FDIC is estopped from advancing them, and (4) ordering that the McGinnis, Juban firm is not vicariously liable for some of the alleged acts of malpractice committed by one of its partners.

Plaintiff has responded to defendants' motions with its own motions for summary judgment: (1) dismissing the estoppel defenses and (2) ordering that the McGinnis, Juban firm is vicariously liable for all its partner's alleged wrongdoing. Plaintiff has also filed motions for summary judgment (1) dismissing the defenses based on the comparative fault of the failed institution's former officers and directors, and (2) dismissing the defenses alleging that the FDIC was contributorily negligent and that it failed to mitigated its damages.

For the reasons that follow, defendants' motions are DENIED. The FDIC's motions are GRANTED.[1]

---

[*] Sitting by designation.

[1] In conjunction with each of its motions for summary judgment, the FDIC has also moved to exclude all evidence related to proof of any defense that is dismissed. Although the Court dismisses all the affirmative defenses challenged by the FDIC, the Court cannot now make the sweeping in limine ruling requested by the FDIC. If presented with proper objections focused on particular evidence, the Court will then consider the admissibility of discrete evidence at the proper time (and will be guided by this opinion).

## BACKGROUND

In this case, still another federal court is left to pick up the pieces after a bank failure. In late Spring 1986, Sun Belt Federal Bank, F.S.B., a Louisiana savings and loan institution, was declared insolvent and the Federal Savings and Loan Insurance Company was appointed receiver of the failed institution. The FDIC[2] has sued the defendants, alleging that George Bevan, a Baton Rouge lawyer, committed malpractice in the course of representing Sun Belt as the closing attorney on a loan that ended up in default.

In late February 1985, Sun Belt extended an $898,000 loan to Mande Cove, Inc. In preparing the deal, Sun Belt hired, as is apparently customary, Mr. Bevan to serve as the closing attorney on the loan. George Bevan was a partner in the firm of McGinnis, Juban, Bevan, Mullins & Patterson, P.C. At the very least, the closing attorney's duties included (1) performing a title search on any real estate advanced as collateral and preparing a certificate of title examination, (2) preparing the necessary loan and mortgage documents, and (3) closing the transaction (including any act of sale involved). The FDIC, however, contends that the responsibilities of such a professional extend further and require the closing attorney to advise the institution concerning all relevant legal matters affecting the transaction, and to otherwise protect the bank's interests in the deal.

Ultimately, Mande Cove defaulted on the Sun Belt loan. The FDIC contends that had Bevan not committed certain acts of malpractice while acting as the closing attorney for Sun Belt, the bank would have learned that the transaction was ill-advised and either would have not made the loan, or would have restructured the deal to make it less risky.

---

[2] Shortly after FSLIC filed this suit in 1989, the FDIC succeeded to FSLIC's interest as plaintiff in the case under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").

Specifically, the FDIC maintains that Bevan breached his duties as the closing attorney in three ways. First, the FDIC says that Bevan performed a negligent title search on the property that was used for collateral. The FDIC maintains that Sun Belt required at least a second mortgage on the property. According to the FDIC, Bevan certified to Sun Belt that the subject property was only encumbered by a $175,000 first mortgage. Thus, Bevan apparently told Sun Belt, the bank could get the required second mortgage. The FDIC says that Sun Belt relied on Bevan's assurance and extended credit to Mande Cove. However, the FDIC contends that the property was in fact subject to a $1 million mortgage in addition to the $175,000 encumbrance Bevan had disclosed.

The FDIC says that if Sun Belt had known of the existing second mortgage, it either would have somehow restructured the deal to obtain a better position, or it would have refused to lend Mande Cove the money. Instead, Sun Belt made the loan, and when Mande Cove defaulted, it recovered only $25,000 of its lien on the property.

The FDIC also asserts that Bevan either intentionally or negligently failed to reveal crucial facts he knew concerning Mande Cove's circumstances that would have affected Sun Belt's willingness to go through with the loan. The FDIC claims that Bevan knew that Mande Cove had been formed just before it sought the loan, and was composed solely of three people who had previously borrowed substantial amounts of money from the bank.[3] The FDIC adds that Bevan knew that the Mande Cove principals were hoping to borrow this money so that they could use it to pay past due interest on their prior loans from Sun Belt. Moreover, the FDIC contends that Bevan knew, or should have known, that because of the substantial amounts of money the Mande Cove people had previously borrowed, the February 1986 loan would violate the federal one-borrower regulations. The FDIC says that

Bevan violated his fiduciary duties to Sun Belt as its closing attorney, and if he had revealed what he knew to the uninvolved officers and directors of the institution, the bank would have refused the loan.

Finally, the FDIC concludes that Bevan violated his fiduciary responsibilities to Sun Belt by not informing the uninvolved officers and directors that he was representing the Mande Cove principals at the same time that he was acting as Sun Belt's closing attorney in the February 1986 transaction. The FDIC claims that Bevan should have revealed that he had represented the Mande Cove principals in the previous dealings. If the uninterested officers and directors had known of this alleged conflict of interest, the FDIC contends, they would have had the chance to block the loan.

This is not the only civil suit arising out of Sun Belt's failure that the banking authorities brought. In 1986, FSLIC sued some of the officers and directors of Sun Belt, alleging that their negligent, intentional and even criminal conduct in loan approval led to the failed institution's demise. At issue in the prior litigation, called *FSLIC v. Wendell P. Shelton, et al.*, was officer and director misconduct with respect to numerous loan transactions, including the Mande Cove deal. Earlier this year, the FDIC and the officer-director defendants settled the case for $60 million. The Sun Belt disgrace has become permanent lore in the annals of the epidemic of failed financial institutions in this country.

## LAW AND APPLICATION

### I. *General Standards*

#### A.

Summary judgment is appropriate if the record discloses that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). There is no genuine issue of fact if the record, taken as a whole, could not lead a rational trier of fact

---

3. Bevan knew this, says the FDIC, because he not only represented Mande Cove, but he also represented the Mande Cove principals in their previous dealings with Sun Belt.

to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Moreover, the mere existence of some technical factual dispute does not necessarily defeat an otherwise properly supported motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Additionally, Rule 56(e) mandates that once the moving party has presented a properly supported motion for summary judgment, the court must grant the motion unless "the adverse party's response, by affidavit or as otherwise provided in this rule, ... set[s] forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When the one opposing the motion bears the burden of proof on an issue, the moving party properly supports a summary judgment motion on that issue by merely "point[ing] out the absence of evidence supporting the non-moving party's case." *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5 Cir.1991).

### B.

■ One seeking to recover for legal malpractice must prove that "there was an attorney-client relationship, that the attorney was negligent in his representation of the client and that this negligence caused plaintiff[ ] some loss." *Evans v. Detweiler*, 466 So.2d 800, 802 (La.App. 4 Cir.1985).[4] Negligence in this context is a lawyer's failure "to exercise at least that degree of care, skill, and diligence which is exercised by prudent practicing attorneys in his locality." *Ramp v. St. Paul Fire and Marine Ins. Co.*, 263 La. 774, 269 So.2d 239, 244 (1972). Traditional notions of causation govern in the legal malpractice setting:

> It is not enough that defendant was negligent. An attorney is liable for the harm caused by his negligence only if the client proves that such negligence is a proximate cause of that harm. An attorney's negligence would be a proximate cause or a cause-in-fact of harm to a

client if the harm would not have occurred except for that negligence. If the harm would have occurred irrespective of such negligence, then that negligence is not a substantial factor or cause-in-fact.

*Meyers v. Imperial Cas. Indem. Co.*, 451 So.2d 649, 654 (La.App. 3 Cir.1984) (citations omitted).

### II.

#### A. *The Scope of Bevan's Duty*

■ Defendants contend that Sun Belt retained Bevan only "to conduct a title examination on the subject property, prepare the necessary loan and mortgage documents, and to pass on the act of sale." Defendants say that, by express agreement, Bevan's representation was limited to these tasks. He was, in effect, an uncritical scribe; not a lawyer. According to defendants, Bevan's fiduciary duty to Sun Belt did not, as a matter of law, require Bevan to share with Sun Belt his knowledge that the loan may have been unwise or improper because of the possible offense to the federal one-borrower regulations, or because of other irregularities in the borrowers' loan histories (about which he knew).

The Court, however, concludes that fact issues abound regarding the scope of Bevan's duties to Sun Belt. It is certainly true, as both parties recognize, that in Louisiana the attorney-client relationship (and, therefore, the scope of the lawyer's fiduciary duty to the client) is defined and limited by any contractual agreement between the lawyer and client as to the scope of the representation. *See Grand Isle Campsites, Inc. v. Cheek*, 262 La. 5, 262 So.2d 350, 359 (1972). Defendants argue that *Cheek* controls here. But the Court disagrees.

In *Cheek*, a corporation sued a promoter and the promoter's lawyer, Fetzer, to recover a secret profit the promoter made because of the promoter's alleged breach of fiduciary duty and breach of trust in

---

**4.** The parties do not dispute that Louisiana law controls the substance of the FDIC's malpractice claims. However, the applicability of state versus federal rules is seriously contested on some other points.

connection with a real estate deal. The corporation asked Fetzer to "prepare[ ] the act of sale ... to the corporation, the mortgage from the corporation to the Lafayette Bank, a mortgagee's title opinion and the necessary corporation minutes and resolutions." *Id.* at 353. The Louisiana Supreme Court held that Fetzer could not be held liable for failing to tell the corporation that the promoter was receiving a secret profit from the transaction.

The *Cheek* court reasoned that the scope of Fetzer's responsibilities to the corporation was "limited by the express agreement between him and the corporation's officers." *Id.* at 359 (internal quotation omitted). The court noted that Fetzer had been specifically "retained to check a title on property and pass on an act of sale", and, therefore, he had no duty to "investigate the preliminary negotiations of the parties and involve himself in questions of how the parties arrived at the stated price." *Id.* (internal quotation omitted).

The result in *Cheek* turned on the court's factual finding that Fetzer and the corporation had contractually limited the scope of his representation. But factual disputes remain as to what Sun Belt hired Bevan to do. Sun Belt clearly retained Bevan to do some of the same ministerial loan closing tasks that Fetzer was hired to perform in *Cheek*. But the record suggests that Bevan's duties may have been more comprehensive.

One of FDIC's experts, Malcolm Meyer, says that a Louisiana closing attorney exercising the ordinary standard of care imposed on such attorneys in this state would have recognized that the Mande Cove transaction violated the federal one-borrower regulations. Meyer concludes that Bevan had a fiduciary duty, under Louisiana standards of care applicable to closing lawyers, to disclose to uninvolved Sun Belt representatives that the transaction was being structured to circumvent certain discrete federal regulations. Additionally, Meyer says that a closing lawyer who knows what the FDIC claims Bevan knew is duty-bound to refuse to participate in the transaction. His view has an appealing common sense ring of clarity to it.

Alton Tullos, the chief Sun Belt loan officer, testified that in the course of closing a loan, Sun Belt loan officers obviously did not want to breach federal regulations, and the officers looked to the closing attorney to assist them in preventing violations. Maybe ... maybe not. Harry Adcock of Sun Belt similarly testified that he would refer to legal counsel to answer questions he had regarding possible violations of the one-borrower regulations.

In contrast, defendants have pointed to nothing in the record to contradict Meyer's testimony regarding the generally recognized duties of Louisiana closing attorneys. Indeed, Sun Belt's officers have testified that when they retained an attorney to close a loan, they expected him not only to complete the ministerial duties involved in closing the loan, but also to answer questions regarding federal regulations. Unlike *Cheek*, we have no record evidence that Bevan and Sun Belt expressly agreed that Bevan's representation would be more cramped than that of the usual closing attorney.

The FDIC points to substantial evidence in the record that the duties of a Louisiana closing attorney generally extend well beyond merely conducting a title examination, preparing loan documents and passing the act of sale. The FDIC has likewise demonstrated that Sun Belt's officers may have expected more of their closing attorneys than mere ministerial work. And there is no evidence that, in this particular instance, Sun Belt agreed that Bevan's representation as the Mande Cove closing attorney was contractually limited.

### B. *The Conflict of Interest*

Defendants next maintain that plaintiff cannot recover on its claims that Bevan's representation of Baton Rouge Petroleum and Miller Development in past loans and in the February 1986 Mande Cove transaction created a conflict of interest which Bevan should have disclosed to Sun Belt's uninvolved officers. Defendants contend that summary judgment is appropriate on any claims arising out of the alleged con-

flict because it is undisputed that all the interested parties to the loan knew of Bevan's past representation of Baton Rouge Petroleum and Miller Development and of his representation of these entities in connection with the Mande Cove transaction.

However, the evidence regarding what the disinterested directors may have known conflicts. Alton Tullos testified that he knew that Bevan was acting on behalf of both Sun Belt and the Mande Cove borrowers in connection with that loan. But even if he was a disinterested person, the record testimony of at least one other uninvolved Sun Belt director suggests that he and the others who were not directly involved in the Mande Cove loan and did not know of Bevan's possible conflict before they voted to ratify the loan. People now distance themselves from others.

Plaintiff points to the deposition testimony of Robert Amacker, Jr., a Sun Belt director. Amacker said that at the time he voted to approve the Mande Cove loan, he did not know that Bevan had represented Baton Rouge Petroleum and Miller Development in the earlier transactions, nor did he know that Mande Cove had been started by principals of Baton Rouge Petroleum and Miller Development. Amacker also testified that to his knowledge, Bevan had not told any of the uninvolved Sun Belt directors about this potential conflict. Finally, he said that this would have been the sort of thing he would have wanted to know about before voting on a loan, and that it might have led him to vote against the Mande Cove transaction.[5]

On summary judgment, the Court cannot resolve conflicts between the Tullos and Amacker testimony. Thus, fact issues remain as to (1) whether there was a potential conflict; (2) whether Bevan informed Sun Belt's uninvolved directors of any conflict that may have existed; (3) what the uninvolved directors may have known from sources other than Bevan; (4) if Bevan did fail to notify the uninvolved directors of any potential conflict, whether he was negligent; and (5) if there was negligence in this regard, whether that negligence caused Sun Belt any injury.

## III. *Vicarious Liability*

The McGinnis, Juban defendants[6] contend that, even if Bevan is liable to the FDIC for malpractice, they cannot be held vicariously responsible for the wrongful acts about which the FDIC complains because (1) there is no partnership liability for a member's fraudulent or intentional torts or breach of fiduciary duty; and (2) Bevan was not acting within the course and scope of the McGinnis, Juban partnership business. The FDIC responds that, at the very least, factual issues remain for trial on vicarious liability. But the FDIC goes further, and moves for summary judgment that, as a matter of law, the McGinnis, Juban defendants are vicariously liable for all the wrongdoing alleged against Bevan (provided, of course, that the FDIC proves Bevan's fault). The Court agrees with the FDIC, although the decision is not a pleasant one to make.

### A.

■ In Louisiana, as elsewhere, a partnership and its individual members are vicariously liable for torts committed by any partner in the course and scope of the partnership business. *See Succession of Killingsworth*, 292 So.2d 536, 545 (La. 1973); *McCaskill v. Welch*, 463 So.2d 942, 949 (La.App. 3 Cir.), *cert. denied*, 466 So.2d 469 (La.1985); *Edkins v. Edwards*, 235 So.2d 200, 206 (La.App. 4 Cir.1970). Vicarious liability, obviously, is liability without fault. That is, the partnership and partners are responsible even though they neither participated in, nor knew of, the other

---

**5.** The testimony of the principals of Baton Rouge Petroleum and Miller Developments that they knew of Bevan's apparent dual representation in the Mande Cove deal is immaterial to the FDIC's conflict of interest claims. The focus is on what the disinterested Sun Belt directors knew or should have known.

**6.** These defendants include the McGinnis, Juban law firm and the firm's malpractice liability

partner's wrongdoing.[7] *See McCaskill, supra.*

However, the McGinnis, Juban defendants contend that there can be no partnership liability for a member's intentional or fraudulent misconduct, or for a member's breach of a fiduciary duty. Therefore, these defendants say, whatever may be true as to their liability for Bevan's negligence,[8] they cannot be held responsible for any of Bevan's other alleged misconduct, even if arguably done in the course and scope of the partnership business.

■ Louisiana law has not so restricted partner liability. The Louisiana Supreme Court held almost seventy-five years ago that "[p]artners are liable in civil actions upon the principle of agency for the fraudulent or malicious conduct of one of their number done without the knowledge of the others for the benefit of the partnership and within the scope of its business." (internal quotation omitted). *Guarantee Trust & Safe Deposit Co. v. E.C. Drew Investment Co.*, 107 La. 251, 31 So. 736, 738 (1908). Vicarious liability, therefore, depends on whether the act was done in the course and scope of the partnership business for the benefit of the partnership, and not, as harsh is it may seem, on the wrongdoer's state of mind.

■ Case literature in Louisiana defining "the course and scope of the partnership business" is sparse. However, partnership liability is grounded in agency principles because "each partner acts both as principal and agent of the other as to acts done within the apparent scope of the business and purpose of the partnership and for its benefit." *McCaskill, supra.* Thus, the Court looks to Louisiana agency law, which, like partnership law, holds the principal (the master) vicariously liable for even the intentional torts of his the agent (the servant) provided the servant was acting within the course and scope of his employment. *See LeBrane v. Lewis*, 292 So.2d 216, 217 (La.1974) (supervisor's stabbing of recently discharged employee is within the course and scope of employment); *Home Life Ins. Co. v. Equitable Equipment Co.*, 680 F.2d 1056, 1058–59 (5 Cir.1982) (interpreting Louisiana law). In *LeBrane*, the Louisiana Supreme Court wrote that an intentional tort is committed within the scope of employment if:

> the tortious conduct … was so closely connected in time, place, and causation as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests.

*LeBrane, supra*, at 218; *Aaron v. New Orleans Riverwalk Association*, 580 So.2d 1119, 1121 (La.App. 4 Cir.), *cert. denied*, 586 So.2d 534 (La.1991).

### B.

■ These guiding principles and the undisputed facts compel the conclusion that all the allegations against Bevan implicate conduct that, if proven, will have necessarily been done in the course of the McGinnis, Juban partnership business.

Defendants admit that Bevan was a partner in the firm, that Bevan was considered by firm members to have special expertise in real estate matters, that Sun Belt retained Bevan to close the Mande Cove deal, and that the firm received $3,750 in legal fees in connection with the loan closing. And so, defendants cannot seriously contest that loan closings were "done by [McGinnis, Juban] lawyers with such frequency or appropriateness as to [have] become a phase of the practice." *Rouse v. Pollard*, 130 N.J.Eq. 204, 21 A.2d 801 (Ct. Err. & App.1941).

---

insurance carrier, New England Insurance Company.

7. Thus, the McGinnis, Juban defendants' continued reliance on their blindness to Bevan's activities in connection with the Mande Cove transaction is irrelevant in this context. If vicarious liability required knowledge or participation, the doctrine would be meaningless.

8. The McGinnis, Juban defendants admit that they are vicariously liable for any negligence of Bevan "within the scope of the normal business of the firm: performing the title examination, preparing the loan and mortgage documents, and passing the act of sale."

In Count I–A of the FDIC's amended complaint, the FDIC maintains that Bevan knew of facts surrounding this loan that should have indicated to him that the Mande Cove transaction would violate federal regulations, and that he failed, either intentionally or negligently, to tell the disinterested Sun Belt directors of these circumstances. The FDIC says that this was a violation of Bevan's fiduciary duty to the bank as its closing attorney. Defendants hotly contest that Bevan's responsibilities as closing attorney required him to disclose to Sun Belt the circumstances that may have made the loan unwise.

The only way the FDIC can win on its claim is to prove that Bevan breached a duty imposed in Louisiana on closing attorneys generally, and that Bevan and Sun Belt had not contractually narrowed that duty. The FDIC will not recover on Count I–A unless it can prove that Bevan's representation of Sun Belt included the fiduciary duty to reveal the allegedly detrimental circumstances of the loan. McGinnis, Juban concede, as they must, that Bevan was acting within the scope of the partnership business when he represented Sun Belt in connection with the Mande Cove transaction. Thus, Bevan's breach, if any, of a duty that the Sun Belt representation imposed would clearly "be regarded as a risk of harm fairly attributable to [McGinnis, Juban's] business." *LeBrane, supra.* McGinnis, Juban's only argument is that the representation did not impose a duty to disclose the facts Bevan allegedly knew. However, that goes to whether Bevan committed malpractice, and not to whether McGinnis, Juban are vicariously responsible if it is determined that Bevan is liable.

In Count I–B, the FDIC alleges that Bevan breached his fiduciary responsibilities to Sun Belt by (1) failing to disclose that he was representing the Mande Cove's principals in the Mande Cove transaction while simultaneously acting as Sun Belt's closing attorney; and (2) failing to disclose that he had represented the Mande Cove principals in their earlier dealings with Sun Belt. The FDIC maintains that if disinterested Sun Belt directors and officers had known of this alleged conflict of interest, they would

have refused to extend the Mande Cove loan.

Again, in disputing vicarious liability, McGinnis, Juban mistakenly argue the merits of Bevan's responsibility. They contend that at least one, if not all, of the Sun Belt officers knew of Bevan's dual representation. If the FDIC is to recover on this Count, it will have to prove that Bevan had a duty as Sun Belt's closing attorney (a role McGinnis, Juban admit Bevan assumed as part of the partnership business) to disclose the alleged conflict of interest. Whether negligent or intentional, a lawyer's breach of a duty to a firm client imposed by the representation is within the course of the partnership's business.

Thus, the Court grants partial summary judgment that any liability the FDIC eventually proves against George Bevan under Counts I, I–A, or I–B of the complaint is attributable to the McGinnis, Juban defendants under general principles of partnership liability.

### IV. *Estoppel*

Defendants maintain that the FDIC should be estopped from asserting its claims arising out of the Mande Cove transaction under two theories. First, defendants contend that the suit should be barred by the doctrine of judicial estoppel because the FDIC's allegations that defendants are responsible are contrary to the FDIC's position in the Shelton litigation that Sun Belt's losses were caused by the criminal, fraudulent and negligent acts and omissions of the bank's officers and directors. Second, defendants say that the FDIC is estopped from recovering for the defendants' wrongdoing, if any, because the fraud, fault and wrongdoing of the Sun Belt officers and directors should be imputed to the FDIC. The FDIC has responded to defendant's imputation arguments with a motion for summary judgment dismissing the imputation defenses.

#### A.

 Judicial estoppel bars one who has assumed a particular position in his pleadings from later assuming an inconsistent position. *See Brandon v. Interfirst*

*Corp.,* 858 F.2d 266, 268 (5 Cir.1988). This doctrine, designed to protect the integrity of the courts, generally "applies in cases where a party attempts to contradict his own sworn statements in ... prior litigation." *Id.* Defendants contend that, having maintained in the Shelton suit that Sun Belt officers and directors were responsible for the bank's losses on the Mande Cove loan, the FDIC has assumed an inconsistent position in this case by attempting to hold defendants liable for the same losses.

However, in these related cases, the FDIC has merely attempted to recover damages from two sets of fiduciaries it contends jointly caused Sun Belt to lose money on a bad loan. Louisiana law that was applicable when the claims in this case arose provided that joint tortfeasors whose actions combine to cause damages to a third party are each solidarily liable for all the resulting damage. *See* La.Civ.Code art. 2324 (West 1987) ("Persons whose concurring fault has caused injury, death or loss to another are also answerable, *in solido....*"); *Vicknair v. Hibernia Building Corp.,* 479 So.2d 904, 910 (La.1985).[9]

It cannot be convincingly argued that the FDIC has taken a position in this case inconsistent with its arguments in the Shelton litigation in attempting to recover the full amount of the loss from the Mande Cove deal from officers and directors on the one hand, and Bevan and the McGinnis, Juban firm on the other. The FDIC has merely sued all those it contends had a role in the misdeeds.

### B.

A more serious argument is that the FDIC should be barred from recovering damages in this case because the wrongdoing of the Sun Belt officers and directors should be imputed to the FDIC. Defendant maintains that it is clear that officer and director wrongdoing is attributable to Sun Belt and would have prohibited the bank from suing for malpractice about the Mande Cove deal. Defendant says that because the FDIC, as receiver of Sun Belt merely stands in the shoes of Sun Belt in this suit, the shoes ought to hurt, and officer and director misconduct likewise bars the FDIC's malpractice claims. The FDIC moves for summary judgment that these imputation defenses are without merit, as a matter of law.

Even assuming that Sun Belt officer and director wrongdoing is attributable to Sun Belt and would have barred a suit by the bank against these defendants;[10] the Court agrees with the FDIC that such conduct cannot also be imputed to the FDIC as the bank's receiver.

The foundation of defendants' imputation defenses is anchored to the theme that "when the FDIC ... acts as receiver, it stands in the shoes of the insolvent bank." (quoting *Owen v. RTC,* 766 F.Supp. 1163 (S.D.Fla.1991)). Defendants rely on well-settled principles of assignment. They say that the one who acquires another's claim by assignment is also subject to any pre-assignment defenses to the claim. *See, e.g., Herlitz Construction Co. v. Matherne,* 476 So.2d 1037, 1040 (La.App. 3 Cir. 1985) ("An assignee acquires no greater rights than its assignor.").

But this argument for the application of general assignment principles ignores the long line of decisions, rooted in the policy

---

**9.** The Louisiana Legislature amended art. 2324 in 1988. *See* La.Civ.Code art. 2324 (West 1988). However, because all the alleged wrongdoing in this case happened before 1988, the pre-amendment version of art. 2324 applies. *See Perez v. State,* 578 So.2d 1199, 1205–06 (La.App. 4 Cir. 1991) (Amended art. 2324 does not apply retroactively to an accident which occurred prior to the effective date of the amendment). This Court also feels obliged to take the opportunity to observe that the present version of art. 2324 makes little sense and needs to be reexamined by the Legislature.

**10.** It is not clear that this would be the case. When corporate insiders engage in misconduct, their wrongdoing is not attributable to the bank if the insiders, and not the institution, benefit from the wrongdoing. *See Schacht v. Brown,* 711 F.2d 1343, 1347 (7 Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983); *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 457 (7 Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982). And in this case, the Sun Belt officers, through their misconduct, ultimately led the institution to insolvency.

and history that animated the creation of the FDIC, which recognized that in some contexts the FDIC should enjoy a better position in post-receivership litigation than the failed institution would have had in pursuing the same claims. One court in this circuit has pointed out that, although ordinarily the general rule of assignment applies to the FDIC, "there are certain situations in which the FDIC acquires greater rights than its predecessor and may avoid defenses to which the assignor would have been subject." *FDIC v. National Union Fire Ins. Co.,* 630 F.Supp. 1149, 1152 (W.D.La.1986).

■■■ For instance, and perhaps most well known, the so-called *D'Oench, Duhme* doctrine instructs that one who has dealt with a subsequently failed institution may not assert a claim or defense against the FDIC that depends on an agreement with the failed bank that is not reflected in the bank's records. *See Texas Refrigeration Supply, Inc. v. FDIC,* 953 F.2d 975, 979 (5 Cir.1992). This equitable defense applies regardless of whether the understanding would have been enforceable against the bank. *See First State Bank of Wayne County, Kentucky v. City and County Bank of Knox County, Tennessee,* 872 F.2d 707, 718 (6 Cir.1989).

Moreover, an insurance company cannot always raise the same coverage defenses against the FDIC that it could have had against the failed bank. *See FDIC v. Zaborac,* 773 F.Supp. 137, 143–44 (C.D.Ill.1991); *FDIC v. Zandstra,* 756 F.Supp. 429, 432–33 (N.D.Cal.1990); *Branning v. CNA Ins. Companies,* 721 F.Supp. 1180, 1184 (W.D.Wash.1989); *FDIC v. Mmahat,* 1988 WL 19304, 1988 U.S.Dist Lexis 1825 (E.D.La. March 3, 1988).

The doctrinal underpinning of these decisions is their unanimous conclusion that the FDIC (or the FSLIC), unlike an ordinary assignee, does not simply stand in the shoes of the failed bank when it takes over an institution. *See D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (Jackson, J., concurring) (As receiver of the failed bank, the FDIC does "not merely step into the private

shoes of the local banks."); *National Union Fire, supra; Zaborac, supra,* at 143 ("[T]he FDIC does not merely stand in the shoes of the party under which it assumed the lawsuit."); *Zandstra, supra,* at 432 ("FDIC does not strictly 'step into the shoes' of a failed bank."); *Branning, supra* ("FSLIC does not merely stand in the shoes of [the failed institution]."); *Mmahat, supra* (FSLIC operates in several capacities, and its "status as subrogee of the institution that would have been precluded from suing under the policy exclusion is therefore not sufficient to require dismissal of FSLIC's claims.").

But while the logic and policy concerns that drive these decisions are instructive, the circumstances involved in those cases were not factually similar to this case. That is not true, however, of the Ninth Circuit's recent decision in *FDIC v. O'Melveny & Meyers,* 969 F.2d 744 (9 Cir.1992). In *O'Melveny,* the FDIC, as receiver for the failed American Diversified Savings Bank, sued a distinguished law firm for professional negligence in connection with advice and services rendered to ADSB. *Id.* at 746. Specifically, the FDIC contended that the firm provided false and misleading information in documents it helped the bank write, called "Private Placement Memoranda," which were intended to provide information about, and induce investors to enter, certain real estate deals. *Id.* at 746.

After taking over as receiver, the FDIC began getting complaints from investors that the Private Placement Memoranda were misleading. The FDIC agreed and refunded the investments, retaining all claims the investors may have had arising out of the deals. The FDIC sued the firm for professional negligence, misrepresentation and breach of fiduciary duty. *Id.* at 747.

But the firm, like defendants here, maintained that the wrongdoing of two of the bank's officers contributed to the damage. The firm argued, among other things, that the FDIC was estopped from pursuing a claim against it, even if it was negligent, because "the FDIC stands in the shoes of

the wrongdoers at ADSB, and FDIC's claims for relief are 'barred by the plaintiff's unclean hands.'" *Id.* at 749.

The Ninth Circuit rejected this argument. The court assumed, although it doubted that this was the case, that the officers' wrongdoing could be imputed to the bank. Invoking traditional equity principles, the court concluded that, in any event, "equitable defenses good against a bank do not carry over against the bank's receiver." *Id.* at 751. The court relied heavily on the unique nature of the FDIC's receivership. The court pointed out that the FDIC does not voluntarily assume the assets of the failed bank, but, rather, it is statutorily obliged to do so. *Id.* at 751–52; *see also* 12 U.S.C. § 1821(c)(2)(A)(ii).

Additionally, the court noted that the FDIC "was neither a party to the original inequitable conduct, nor is it in a position to take action prior to assuming the bank's assets to cure any associated defects or force the bank to pay for incurable defects." *O'Melveny, supra.* Thus, *O'Melveny* recognized that the FDIC's status is markedly different from the ordinary assignee who voluntarily buys a bank or its assets and "can adjust the purchase price for the diminished value of the bank's assets due to their associated equitable defenses." *Id.*

The court's result was also driven by the fact that the FDIC takes over as part of an complicated regulatory scheme directed at protecting the interests of third parties who, like the FDIC, were also not privy to the institution's inequitable conduct. *Id.* To hold the FDIC subject to defenses based on this inequitable conduct by imputation, the court said, would frustrate this Congressional purpose by "diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets." *Id.* at 752. The court concluded that the "FDIC, acting as an involuntary successor in interest pursuant to a federal regulatory scheme, is not estopped from litigating its claims against O'Melveny because of the 'unclean hands' of the ADSB insiders." *Id.* at 752.

The Ninth Circuit's decision in *O'Melveny* provides a powerful guidance for this Court. To say that the FDIC should be subject to equitable defenses that are good against the predecessor bank would be, as *O'Melveny* teaches, to "elevate form over substance." *Id.* Only a rule that exempts the FDIC from these defenses remains faithful to both long-standing equitable principles and to the FDIC's statutory mission as receiver. As one court has written, "[i]t is self-evident that if the FDIC could be visited by the sins of its predecessor, [the failed bank], the policy aim of Congress could be completely frustrated." *In re Charter Executive Center, Ltd.*, 34 B.R. 131, 135 (Bankr.M.D.Fla.1983).

Thus, the defenses based on imputation of the wrongdoing of the officers and directors of Sun Belt to the FDIC fail as a matter of law. Summary judgment dismissing these defenses is appropriate.

## V. Comparative Fault: Officer and Director Wrongdoing and Settlement Bar Rules

What, then, can be the relevance of the alleged wrongdoing of the Sun Belt officers and directors? Defendant has asserted affirmative defenses based on the comparative fault of the Sun Belt officers and directors.[11] The FDIC has moved for summary judgment dismissing these defenses. The question on this motion is which of two competing settlement bar rules governs this action?

In the Shelton litigation, the FDIC sued various Sun Belt officers and directors for liability arising out of their roles in the downfall of the bank. Sixty-eight separate transactions involving eighty-seven loans, including the Mande Cove deal, were at issue. In March 1992, the Shelton suit was settled for $60 million.

Plaintiff maintains that the Court should apply a *pro tanto* settlement bar rule to this case. Under the *pro tanto* rule, defendants who ultimately do not settle are entitled to a credit against any verdict at trial in the dollar amount the

---

11. Defendant styles these defenses "comparative negligence, victim fault and estoppel."

settling defendants paid that is attributable to the common loss. *See FDIC v. Mmahat,* 907 F.2d 546, 550 (5 Cir.1990). Defendants, however, say that Louisiana's proportionate reduction rule governs. *See* La.Civ. Code art. 1804; *Joseph v. Ford Motor Co.,* 509 So.2d 1 (La.1987). In Louisiana, the trier of fact must decide the relative fault of each defendant (including those who have settled), and the damages award is then reduced by the proportion of fault attributed to the settling defendants.

The resolution of this issue controls the decision on the FDIC's motion because if the *pro tanto* rule applies, defendants will not be permitted to prove officer and director fault at trial. The only reduction of what defendants would have to pay if found liable would be the reduction of the verdict by the dollar portion of the Shelton settlement encompassing loss from the Mande Cove transaction. On the other hand, the proportional reduction rule would leave in place defendants' comparative negligence defense because the reduction would be directly determined by the relative fault of the officers and directors.

### A.

There can be no doubt that "[f]ederal law governs the determination of the rights of the FDIC." *FDIC v. Lattimore Land Corp.,* 656 F.2d 139, 143 n. 6 (5 Cir.1981); *see also* 12 U.S.C. § 1819(b)(2)(A) ("suits of a civil nature ... to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States"); *FDIC v. Bank of San Francisco,* 817 F.2d 1395, 1398 (9 Cir.1987); *FDIC v. Blue Rock Shopping Center, Inc.,* 766 F.2d 744, 747 (3 Cir.1985). The more difficult task, however, "is giving content to th[e] federal rule." *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 727, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979).

■ When federal law applies, but no act of Congress controls, federal courts must divine "federal common law." *See Clearfield Trust Co. v. United States,* 318

U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943); *Bank of San Francisco, supra.* Courts draw on two sources when defining the federal common law. First, courts may choose to adopt state law. *See Kimbell Foods, supra,* 440 U.S. at 728, 99 S.Ct. at 1458. Or courts can look to "the federal law merchant as 'a convenient source of reference.' " *Bank of San Francisco, supra* (quoting *Clearfield Trust, supra* ).

*Kimbell Foods* instructs that a court should weigh three criteria when determining whether it should adopt state law or develop a nationally uniform federal rule: (1) whether there is a need for a nationally uniform body of federal law; (2) whether application of state rules "would frustrate specific objectives of the federal programs"; and (3) whether and to what extent the "application of a federal rule would disrupt commercial relationships predicated on state law." *Kimbell Foods, supra,* 440 U.S. at 728–29, 99 S.Ct. at 1459; *see also Kamen v. Kemper Financial Services, Inc.,* —— U.S. ——, ——, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991).

■ The FDIC maintains that this Court should join others that have applied the *pro tanto* rule to FDIC litigation against bank officers and directors [12] to help fashion a uniform national settlement bar rule in these cases. Defendant, on the other hand, argues for incorporation of Louisiana proportional reduction principles. *Kimbell Foods* and *FDIC v. Geldermann,* 763 F.Supp. 524 (W.D.Okla.1990), lead this Court to conclude that the *pro tanto* rule should be established as the national uniform settlement bar rule in FDIC litigation, given the nation-wide scope of the collapse of the financial institution infrastructure.

### B.

Courts applying *Kimbell Foods* in FDIC litigation have generally held that national uniformity of rules affecting the FDIC's rights is desirable. *See Blue Rock, supra,* at 748; *FDIC v. Rodenberg,* 571 F.Supp.

---

**12.** *See FDIC v. Matherne,* CA 89–5388 (E.D.La. January 8, 1992); *FDIC v. Anders,* CA 8–87–430, slip op. at 6, 1991 WL 442874 (E.D.Cal. July 2, 1991), *petition for interlocutory appeal denied,*

No. 91–80215 (9 Cir. August 22, 1991); *FDIC v. Geldermann, Inc.,* 763 F.Supp. 524, 526–32 (W.D.Okla.1990).

455, 460 (D.Md.1983). This Court agrees. No serious state-federal balance is at stake to compel homage to a local law doctrine. In the laws concerning the federal deposit insurance fund and creating the FDIC, Congress has created a "program [that] is grand in scale." *Id.* By enacting this sprawling statutory scheme, Congress has left little doubt that uniformity of standards governing the regulation of banks and the federal bank insurance system is to be the rule, rather than the exception.

As to the second *Kimbell Foods* factor, holding the FDIC to different standards in virtually identical litigation in different states would certainly frustrate the FDIC's statutory mission "to promote the stability of and confidence in our nation's banking system." *Blue Rock, supra; see also FSLIC v. Murray,* 853 F.2d 1251, 1256 (5 Cir.1988). Indeed, several courts have called for a national federal settlement bar rule (and have rejected the adoption of state statutes) in the securities regulation context primarily because the disparity in results that would inevitably follow the adoption of different state settlement bar statutes would encourage forum shopping and create unpredictability that would perplex the federal regulatory scheme. *See, e.g., Franklin v. Kaypro Corp.,* 884 F.2d 1222, 1228 (9 Cir.1989) (Holding that there should be a uniform federal settlement bar rule in federal securities litigation because of the chaos and rampant forum shopping that would arise from adoption of disparate state statutes); *Singer v. Olympia Brewing Co.,* 878 F.2d 596, 600 (2 Cir.1989) (same).

These concerns are heightened when the rights of the FDIC are affected. The FDIC's statutory mission is to promote and maintain the stability of the federal deposit insurance fund and the public's confidence in the viability of the banking system. The litigation costs associated with determining the correct state rule in each case, as well as the uncertainty of risk and forum shopping that are certain to result (and, indeed, have resulted to some degree already in this case), weigh heavily in favor of the establishment of a national uniform settlement bar rule in FDIC cases.

Finally, applying a uniform federal settlement bar rule in litigation involving the FDIC upsets no state law-based commercial relationships. *See FDIC v. Main Hurdman,* 655 F.Supp. 259, 266 (E.D.Cal. 1987) ("[T]he alleged relationship between the bank and defendant is victim and tortfeasor, and thus no commercial relationship predicated on state law is implicated at all.").

Thus, the Court agrees with *Geldermann,* that, as in the securities regulation setting, federal courts should adopt a uniform federal settlement bar rule in FDIC cases. *See Geldermann, supra.*

But what rule? *Pro tanto* or proportionate reduction? The few courts that have considered this issue in FDIC litigation against former fiduciaries of failed institutions (like officers, directors and attorneys) have unanimously adopted the *pro tanto* rule. *See Matherne, supra; Anders, supra; Geldermann, supra.*[13] Decisions in other contexts have diverged somewhat on which is the preferable rule. *Compare Singer,* 878 F.2d at 600 (adopting *pro tanto* rule in securities case); *Sears v. Atchison, Topeka & Santa Fe Ry.,* 749 F.2d 1451, 1455 (10 Cir.), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985) (same rule in Title VII action); *Miller v. Apartments & Homes of N.J., Inc.,* 646 F.2d 101, 109–10 (3 Cir.1981) (favoring *pro tanto* rule in civil rights litigation); *MFS Municipal Income Trust v. American Medical International, Inc.,* 751 F.Supp. 279, 285–86 (D.Mass.1990) (*pro tanto* rule should apply in securities cases); *Dalton v. Alston & Bird,* 741 F.Supp. 157, 160 (S.D.Ill.1990) (following *Singer*) *and In re Terra–Drill Partnerships Securities Litigation,* 726 F.Supp. 655, 656 (S.D.Tex.1989) (applying *pro tanto* rule in securities case) *with Franklin,* 884 F.2d at 1231 (adopting

---

**13.** In *Mmahat,* the Fifth Circuit was asked to determine the applicable settlement bar rule in a such cases. However, because the trial judge had ruled that there was insufficient evidence to establish the proportional fault of the settling parties, the court held that the question of which rule applied was moot. *See Mmahat,* 907 F.2d at 550.

proportionate reduction in securities class action); *In re Sunrise Securities Litigation*, 698 F.Supp. 1256, 1261 (E.D.Pa.1988) (same).[14]

The Court agrees that, at least in the context of FDIC litigation against officers, directors, attorneys and other fiduciaries of failed institutions, the *pro tanto* rule is preferable. The Court is guided by the special policy concerns applicable to the FDIC.

When fashioning federal common law rules concerning the rights and liabilities of the FDIC, federal courts are instructed that "[t]he rule in question must not only protect the interests of the parties but also must support the general policy of a strong national banking system." *Gaff v. FDIC*, 919 F.2d 384, 391 (6 Cir.1990), *modified on other grounds*, 933 F.2d 400 (6 Cir.1991). Indeed, when litigating as receiver of a failed institution, the FDIC has a special role quite unlike that of the typical private plaintiff. The FDIC is duty-bound in making decisions regarding the disposition of a failed institution, its assets, and its claims to advance "the best interests of the institution, the depositors of such institution, and the corporation." 12 U.S.C. § 1821(c)(9)(B)(ii). It acts at all times to "preserve and conserve the assets and property of [the] institution," *Id.* at § 1821(d)(2)(B)(iv), for the benefit of the failed institution's creditors and the insurance fund.

Thus, there is a strong policy, not necessarily present when only private parties are involved, to "make[ ] the FDIC as whole as possible." *Geldermann, supra*, at 529. Settlement, even partial settlement, should be encouraged to reduce the costs to the public of recovering the institution's assets, but not at the expense of full recovery. *Id.* The *pro tanto* rule undoubtedly does more to encourage partial settlements by the FDIC than does proportional reduction, because *pro tanto* allocation means that partial settlement does not carry with it the risk that the FDIC will ultimately recover less that the full amount of damages found at trial. Further, non-settling defendants are more likely to settle with the FDIC under a *pro tanto* regime.[15] Settlements are encouraged, thereby reducing the public's litigation costs, while full recovery remains protected.

The primary objection to the *pro tanto* rule is that it is unfair to non-settling defendants who could be held liable at trial for more than their proportionate share of the damages. The perceived unfairness of the *pro tanto* rule is what led the Ninth Circuit to reject the rule in favor of proportional reduction in the securities context. *See Kaypro, supra*. But this Court agrees with *Geldermann* that fairness to defendants is but one of several policies courts should consider in evaluating competing settlement bar rules. *Kaypro*'s overriding concern with this one factor in that case, which involved private plaintiffs and defendants, is perhaps understandable. But fairness to private defendants is not controlling here, because the

---

14. Defendants invoke two Fifth Circuit cases applying proportionate reduction to admiralty settlements for the proposition that the circuit has expressed a clear preference for this rule. *See Dobson v. Camden*, 705 F.2d 759 (5 Cir. 1983), *vacated*, 725 F.2d 1003 (5 Cir.1984) (en banc); *Leger v. Drilling Well Control*, 592 F.2d 1246 (5 Cir.1979). However, the Fifth Circuit's position on this issue is anything but clear. *See Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 835 (5 Cir.1992) (discussing the "apparent tension" in this circuit concerning the appropriate admiralty settlement bar rule and citing recent conflicting panel decisions which have endorsed both approaches).

15. Under the proportionate reduction rule, plaintiffs are less likely to enter into partial settlements because the real amount of a partial settlement cannot be known until the trier of fact determines the parties' relative fault. *See Biben v. Card*, 1991 WL 272848 1991 U.S. Dist Lexis 18448 (W.D.Mo. December 10, 1991). In a *pro tanto* regime, however, the amount of the settlement is fixed when it is made. *Id.* Thus, when proportionate fault applies, a partial settlement leaves the plaintiff with a much greater litigation risk than the same settlement would in a *pro tanto* setting, so that he is more likely to settle under the latter rule. Similarly, if *pro tanto* principles apply, defendants are more likely to settle because if they do not, they face the risk of being found liable at trial for more than their actual fault. Non-settling defendants do not have this concern when proportionate reduction applies. *Id.*

FDIC represents public, as well as private interests. When the FDIC is involved and public interests are directly implicated, "[a]scertainment of the relative culpability of joint tortfeasors is overshadowed by the goal of making the FDIC as whole as feasible." *Id.*[16]

Thus, the Court concludes that when the FDIC sues officers, directors and other fiduciaries of a failed institution, partial settlements (or settlements of related proceedings involving the same loss) are to be credited against any ultimate recovery at trial by reducing the verdict by the dollar amount of the settlement attributable to the common damages. In this case, the amount of the Shelton settlement attributable to the wrongdoing surrounding the Mande Cove loan will be deducted from anything the FDIC recovers from defendants at trial. Plaintiff is, therefore, entitled to summary judgment dismissing the defenses based on comparative fault.

### VI. *FDIC Fault: Contributory Negligence, Mitigation*

Next, the FDIC has moved for summary judgment dismissing defendants' affirmative defenses based on the conduct of the FDIC as regulator of Sun Belt (pre-failure) and on the FDIC's performance as the receiver of Sun Belt (post-failure). These defenses include claims that (1) the FDIC as regulator negligently supervised Sun Belt and that its negligence was a cause of the failure of the institution; (2) that the FDIC was guilty of contributory negligence as Sun Belt's receiver; and (3) the FDIC as receiver failed to mitigate its damage from the alleged misconduct of Bevan and the Sun Belt officers and directors.

The FDIC maintains that the Court does not have subject matter jurisdiction over these defenses because the defendants have not presented the defenses to the agency administrative process. Plaintiff appropriately directs the Court's attention to 12 U.S.C. § 1821(d)(13)(D), which limits federal jurisdiction in FDIC litigation. Section 1821(d)(13)(D) provides:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over—
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

In the related Shelton litigation, the district court held that § 1821(d)(13)(D) deprived the court of jurisdiction over the Sun Belt officers' and directors' affirmative defenses of contributory negligence, failure to mitigate damages and estoppel because they had not first been through the administrative process. *See FDIC v. Shelton*, 789 F.Supp. 1367 (M.D.La.1992). The Court agrees, and therefore, holds that it does not have subject matter jurisdiction to adjudicate defendants' identical affirmative defenses in this case.[17]

---

**16.** In fact, *pro tanto* crediting could be the more fair rule for both plaintiffs and defendants. The non-settling defendants are protected from partial settlements that potentially leave them exposed to an unreasonably high percentage of the fault because courts can conduct "good-faith" hearings concerning the circumstances of settlements. *See, e.g., Geldermann, supra,* at 530; *Dalton, supra,* at 160. Further, the proportionate fault rule also raises fairness problems because "it encourages the non-settling defendants to gang-up on the settling defendant" at trial to attempt to gain "an unfair diminution of the verdict." *MFS Municipal,* 751 F.Supp. at 284. Finally, while *pro tanto* allocation ensures full recovery, it cannot lead to "over-recovery." When a partial settlement is allocated according to proportionate fault, a plaintiff could actually obtain more than 100% of the damages the trier of fact determines he suffered. *See Hardy,* 949 F.2d at 836–37 (Brown, J., concurring). No rule is perfect. Some harshness can result under both regimes. This Court's decision is based strictly on the facts before it in the FDIC setting, none other.

**17.** Although the statute suggests a broader reach, in this case the Court considers its subject matter jurisdiction only as to the affirmative defenses related to the FDIC's conduct. The parties have not briefed the application of FIRREA's jurisdictional limitation to the other affirmative defenses at issue, and, in any event, the

### A.

When endeavoring to interpret a statute as complex and sweeping as FIRREA, which makes the Internal Revenue Code look like child's play, it is helpful to remain grounded in basic tenets of statutory construction. The Court's duty is to "construe a statute consistent with the intent of Congress as expressed in the plain meaning of its language." *Sutton v. United States*, 819 F.2d 1289, 1292 (5 Cir.1987). The analysis begins with the statutory text. *See Guidry v. RTC*, 790 F.Supp. 651, 653 (E.D.La. April 15, 1992). Of course, "[s]pecific words within [the] statute, however, may not be read in isolation of the remainder of that section or the entire statutory scheme." *Sutton, supra*, at 1293. Only when the plain language is unclear does the Court draw on legislative history for hopeful guidance. *See Dibidale of Louisiana, Inc. v. American Bank & Trust Co.*, 916 F.2d 300, 305 (5 Cir.1990). Mindful of these guiding principles, the Court will proceed to apply § 1821(d)(13)(D).

### B.

There can be no doubt, and defendants do not argue to the contrary, that § 1821(d)(13)(D) "clearly establishes an exhaustion requirement" when it applies. *See Meliezer v. RTC*, 952 F.2d 879, 882 (5 Cir.1992). It divests all courts of jurisdiction of certain types of claims against the FDIC, "[e]xcept as otherwise provided" in subsection (d). 12 U.S.C. § 1821(d)(13)(D). Section 1821(d)(6)(A) permits resort to the courts on such claims if the claimant has first filed the claim with the FDIC and the FDIC "has disallowed the claim or the 180–day determination period has expired." *Meliezer, supra*. Then, the appropriate district court "shall have jurisdiction to hear such claim". 12 U.S.C. § 1821(d)(6)(A).

### C.

 But defendant contends that the statute does not apply to affirmative defenses to suits initially brought by the FDIC. The Court disagrees with this extra-textual construction.

Section 1821(d)(13)(D) is unambiguous. Unless § 1821(d) otherwise provides (for instance, if the administrative process has been exhausted), no court has jurisdiction to determine entertain "any action seeking a determination of rights with respect to[ ] the assets of any depository institution for which the Corporation has been appointed receiver." *Id.* at § 1821(d)(13)(D)(i). The FDIC's present claim against defendants is clearly an asset of Sun Belt, the failed institution. *See Shelton*, 789 F.Supp. at 1371. Certainly, any diminution in the claim because of FDIC's mismanagement either as regulator or as receiver, as sought here, "will effect the failed bank's rights and assets." *Id.* Thus, under § 1821(d)(13)(D)(i), the Court does not have jurisdiction to adjudicate the defenses arising out of the FDIC's fault, because the defenses have not been through the administrative process.

Further, § 1821(d)(13)(D)(ii) similarly limits jurisdiction over "any claim relating to any act or omission of ... the Corporation as receiver." *Id.* Again, Congress has been explicit. With its defenses of contributory negligence and failure to mitigate, defendants attempt to reduce the FDIC's recovery in this case because of the FDIC's alleged mismanagement of Sun Belt's assets while acting in its role as receiver. Section 1821(d)(13)(D)(ii), in clear and uncharacteristically simple terms, bars defenses arising out of the FDIC's post-receivership management of Sun Belt's assets.

And nothing in the statute supports defendant's argument that by using the words "claim" and "action" Congress meant to refer only to demands for monetary recovery against the FDIC where the one seeking recovery has haled the FDIC into court.

Courts have, with one voice, held that § 1821(d)(13)(D)'s jurisdictional limits apply to counterclaims against the FDIC, FSLIC and the RTC. *See Shelton, supra*, 789 F.Supp. at 10; *RTC v. Dubois*, 771 F.Supp. 154, 157–58 (M.D.La.1991); *RTC v. Residential Developers Fund Partners*, 1991

Court has held that those defenses should be dismissed on the merits.

WL 193363 (E.D.Pa. September 17, 1991); *RTC v. Shoreview Builders*, 252 N.J.Super. 408, 599 A.2d 1291 (N.J.Super.1991). It would be anomalous and inconsistent with FIRREA's plain language to hold that jurisdiction over certain requests for relief against the FDIC depends on who sues first and whether the one asking for relief styles his request as a "claim" (or counterclaim) or a "defense."

Accordingly, the Court holds that under § 1821(d)(13)(D), the Court may not assume subject matter jurisdiction over defendants' affirmative defenses of negligent supervision, contributory negligence and failure to mitigate damages.[18] Summary judgment dismissing these defenses is appropriate.

---

**18.** Like the *Shelton* court, this Court recognizes the "jurisdictional void" created by this interpretation of FIRREA. A court may well, as this Court does here, have subject matter jurisdiction over an FDIC claim but may not be able to adjudicate affirmative defenses or counterclaims in the same suit, until exhaustion of the administrative process. Defendant strenuously contends that this is unfair. Perhaps it is. But such arguments are properly directed to Congress, not courts. The Court cannot, because of some perceived inequity, create subject matter jurisdiction where Congress has clearly forbidden its exercise.